## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Michael D. Benson,

               Plaintiff,

v.

Emily Johnson Piper, Comm. of the Dept. of
Human Services; Shelby Richardson,
MSOP Dir.; Kevin Moser, Fac. Dir.; Terry
Kniesel, Asst. Fac. Dir.; Steve Sadjak, Asst.
Fac. Dir.; Rich O'Conner, Super.; Steve
Sayovitz, Super.; Ron Fischer, Super.; Nate
Johnson, Super.; Mike Goeglein, Super.;
Scott Benoit, Man.; Lori Aldrin, Off. Of the
Day; Julianna Beavens, Off. of the Day;
Ryan Fahland, Asst. Super.; Randy Gordon,
Asst. Super.; Andrea Kosloski, Unit 1-B
Dir.; Brian Ninneman, Unit 1-C Dir.; Robert
Rose, Unit 1-C Dir.; Kathryn Schesso, Clin.
Super.; Jana Korby, Clin. Super.; Tara
Osbourne, Clin. Super.; Nicole Vaineo,
Clin. Ther.; Kyle Randa, Sec. Couns. Lead;
Elizabeth Wyatt, Sec. Couns. Lead; Derrick
Koecher, Sec. Couns. Lead; Scott Gianinni,
Sec. Couns.; Brennan Shorter, Sec. Couns.;
Blake Carey, Sec. Couns.; Gordon Huhta,
Sec. Couns.; Robert Grescyzk Jr., Sec.
Couns.; Wendy McGowan, Sec. Couns
[sic]; Barry Giersdorf, Sec. Couns.; Chris
St. Germain, Sec. Couns.; Jordan Goodman,
Sec. Couns.; Sam Brindamor, Sec. Couns.;
Bruce Lind, Sec. Couns.; Travis Cowell,
Sec. Couns.; Jenny Collelo, Sec. Couns.;
and Paul Michelizzi, Sec. Couns., in their
individual and official capacities,

               Defendants.

Case No. 17-cv-266 (DWF/TNL)

**REPORT &
RECOMMENDATION**

Michael D. Benson, MSOP, 1111 Highway 73, Moose Lake, MN 55767 (pro se Plaintiff); and

Ralph John Detrick, Assistant Attorney General, Minnesota Attorney General's Office, 445 Minnesota Street, Suite 1100, St. Paul, MN 55101-2128 (for Defendants).

## I. INTRODUCTION

This matter comes before the Court on Defendants Emily Johnson Piper, Shelby Richardson, Kevin Moser, Terry Kniesel, Steve Sadjak, Rich O'Conner, Steve Sayovitz, Ron Fischer, Nate Johnson, Mike Goeglein, Scott Benoit, Lori Aldrin, Julianna Beavens, Ryan Fahland, Randy Gordon, Andrea Kosloski, Brian Ninneman, Robert Rose, Kathryn Schesso, Jana Korby, Tara Osbourne, Nicole Vaineo, Kyle Randa, Elizabeth Wyatt, Derrick Koecher, Scott Gianinni, Brennan Shorter, Blake Carey, Gordon Huhta, Robert Grescyzk Jr., Wendy McGowan, Barry Giersdorf, Chris St. Germain, Jordan Goodman, Sam Brindamor, Bruce Lind, Travis Cowell, Jenny Collelo, and Paul Michelizzi's (collectively, "Defendants") Motion to Dismiss Plaintiff's Complaint (ECF No. 24). This motion has been referred to the undersigned for a report and recommendation to the district court, the Honorable Donovan W. Frank, District Judge for the United States District Court for the District of Minnesota, under 28 U.S.C. § 636 and D. Minn. LR 72.1. Based upon the record, memoranda, and proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendants' motion to dismiss be **GRANTED IN PART** and **DENIED IN PART**.

## II. PROCEDURAL HISTORY

On May 19, 2017, Defendants filed the instant motion to dismiss. (ECF No. 24.) The undersigned issued a case management order setting forth a briefing schedule. (ECF

No. 31.)  Following the completion of briefing, this matter was subsequently stayed based on related litigation pending in *Karsjens v. Piper*, Case No. 11-cv-3659 (DWF/TNL). (ECF No. 56.)  On October 22, 2018, the Honorable John R. Tunheim, Chief District Judge for the United States District Court for the District of Minnesota ordered that the stay be lifted.  (ECF No. 59.)  Having been fully briefed prior to the imposition of the stay, Defendants' motion is ripe for a determination on the papers.

## III. ANALYSIS

Plaintiff is involuntarily committed to the Minnesota Sex Offender Program ("MSOP") run by the State of Minnesota's Department of Human Services ("DHS"). (Compl. ¶ 1, ECF No. 1.)  Plaintiff brings this action under 42 U.S.C. § 1983, asserting that Defendants have violated his constitutional rights under the First, Fourth, and Fourteenth Amendments.  Plaintiff also alleges that Defendants have violated his rights under the Minnesota Constitution.  The thrust of Plaintiff's lawsuit is that Defendants have retaliated against him in various ways for filing *Benson v. Fischer*,[1] Case No.16-cv-509 (DWF/TNL) ("ID Lawsuit"), a separate action challenging the identification badges MSOP requires its clients to wear.[2]  *Benson v. Piper*, No. 17-cv-266 (DWF/TNL), 2017 WL 4221105, at * 1 (D. Minn. July 31, 2017), *adopting report and recommendation*, 2017 WL 4220446 (D.

---

[1] *Benson v. Piper*, No. 17-cv-266 (DWF/TNL), 2017 WL 4220446, at *1 n.2 (D. Minn. Sept. 21, 2017) (stating Case No. 16-cv-509 should be referred to as *Benson v. Fischer* going forward "to reflect the dismissal of Defendant Emily Johnson Piper").

[2] The ID Lawsuit was brought against the following defendants: Emily Johnson Piper, Commissioner of the Department of Human Services; Ron Fischer, Group Supervisor/Officer of the Day; Scott Benoit, Program Manager; Andrea Kosloski, Unit 1-B Director; Doug Wilson, Primary Therapist; Dr. Debbie Thao, Clinical Supervisor; Kyle Randa, Security Counselor Lead; Scott Gianinni, Security Counselor Lead; Vaughn Thompson, Security Counselor; Jesse Pruette Security Counselor; P. Jay Siltanen, Security Counselor; Robert Gresczyk, Jr., Security Counselor; Wendy McGowan, Security Counselor; Tayah Johnson, Security Counselor; and Nathan Madsen, Security Counselor.

3

Minn. Sept. 21, 2017).  Plaintiff's Complaint spans 35 pages, names nearly 40 defendants in their individual and official capacities, and encompasses at least 25 separate incidents of purported retaliation between June and December 2016.  As best as the Court is able to tell, Plaintiff's claims can generally be summarized as follows: First Amendment claims for retaliation, free exercise of religion, and defamation based on false behavior reports; Fourth Amendment claims for unreasonable searches and seizures based on a search of his room, strip searches of his person, and placement in more restrictive settings; and Fourteenth Amendment claims for procedural and substantive due process violations based on his placement in more restrictive settings.[3]  According to Plaintiff, Defendants' conduct "can only be explained as being the result of Plaintiff filing . . . [the ID Lawsuit] as other clients are not targeted or harassed in the same way."  (Compl. ¶ 12.)  Plaintiff also raises tandem claims under the Minnesota Constitution.

Defendants move to dismiss this action in its entirety for lack of subject matter jurisdiction and failure to state a claim.

## A. Allegations Considered

"In analyzing a motion to dismiss, a court must accept the allegations contained in the complaint as true and make all reasonable inferences in favor of the nonmoving party." *Martin v. Iowa*, 752 F.3d 725, 727 (8th Cir. 2014).  "At this stage of the litigation, [courts] accept as true all of the factual allegations contained in the complaint, and review the complaint to determine whether its allegations show that the pleader is entitled to relief."

---

[3] Plaintiff states that he is also bringing a "cat's paw retaliation" claim under the Fourteenth Amendment.  (*See, e.g.*, Compl. ¶¶ 2, 8.)  All of Plaintiff's retaliation allegations relate to the filing of the ID Lawsuit.  Accordingly, the Court has construed all retaliation allegations together under the First Amendment.

*Schaaf v. Residential Funding Corp.*, 517 F.3d 544, 549 (8th Cir. 2008). When considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "the court generally must ignore materials outside the pleadings." *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999). Courts may "consider matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned[] without converting the motion [to dismiss] into one for summary judgment." *Miller v. Redwood Toxicology Lab., Inc.*, 688 F.3d 928, 931 n.3 (8th Cir. 2012) (quotation omitted); *see, e.g.*, *Ashanti v. City of Golden Valley*, 666 F.3d 1148, 1150-51 (8th Cir. 2012); *Enervations, Inc. v. Minn. Mining & Mfg. Co.*, 380 F.3d 1066, 1069 (8th Cir. 2004).

In his response to Defendants' motion to dismiss, Plaintiff has included a number of new factual allegations. (*See, e.g.*, Pl.'s Resp. at 3-6, ECF No. 32.) Defendants assert that these allegations are not properly before the Court and request that they not be considered. (Defs.' Reply at 3, ECF No. 36.)

"It is axiomatic that a complaint may not be amended by the briefs in opposition to a motion to dismiss." *Morgan Distrib. Co. v. Unidynamic Corp.*, 868 F.2d 992, 995 (8th Cir. 1989). "Any allegations made in subsequent legal memoranda cannot correct inadequacies within a complaint." *Tuttle v. Lorillard Tobacco Co.*, 118 F. Supp. 2d 954, 959 (D. Minn. 2000); *see also, e.g.*, *Martin v. ReliaStar Life Ins. Co.*, 710 F. Supp. 2d 875, 887 (D. Minn. 2010). "To hold otherwise would mean that a party could unilaterally amend a complaint at will." *Morgan Distrib. Co.*, 868 F.2d at 995 (citation omitted).

The Court recognizes that Plaintiff is proceeding pro se, and pro se litigants are accorded a certain degree of latitude.  At the same time, "[i]n granting the deference owed to pro se parties, [the court may not] assume the role of advocate for the pro se litigant." *Machen v. Iverson*, No. 11-cv-1557 (DWF/JSM), 2012 WL 566977, at *15 (D. Minn. Jan. 23, 2012) (quotation omitted), *report and recommendation adopted*, 2012 WL 567128 (D. Minn. Feb. 21, 2012); *see Bracken v. Dormire*, 247 F.3d 699, 705 (8th Cir. 2001) (Arnold, J., dissenting) ("Of course, a pro se pleading is not a magic hat out of which a court may pull any claim it thinks should have been advanced.").  It is not clear from the "new" allegations in Plaintiff's response which of the nearly 40 Defendants were involved in the acts complained of.  And, it is not clear if Plaintiff is attempting to supplement his existing claims with additional facts or attempting to bring entirely new claims.  In addition, unrelated to the instant motion to dismiss, Plaintiff has filed a motion to consolidate this action with the ID Lawsuit and a motion for leave to amend the Complaint, which the Court will be addressing by separate order.  (ECF Nos. 60, 61.)

While the Court is recommending that several of Plaintiff's claims be dismissed for failure to state a claim, the Court is not recommending that this matter be dismissed in its entirety or, with the exception of Plaintiff's claims based on the Minnesota Constitution, that such claims be dismissed with prejudice.  And although Plaintiff's motion for leave to amend will be denied at this time because Plaintiff has not articulated with any sort of specificity how he seeks to amend the Complaint or complied with Local Rule 15.1 by enclosing a copy of the proposed amended pleading *and* "a version of the proposed amended pleading that shows—through redlining, underlining, strikeouts, or other

similarly effective typographic methods—how the proposed amended pleading differs from the operative pleading," D. Minn. LR 15.1(b), the denial is without prejudice for Plaintiff to bring a proper motion to amend in the future if he wishes to do so. This way, Plaintiff can present all of his proposed amendments in an organized fashion, rather than Defendants and the Court having to guess as to how any such amendments fit into the framework of Plaintiff's existing Complaint.

Accordingly, the Court has considered only the allegations in the Complaint for purposes of Defendants' motion to dismiss.

**B. Jurisdictional Arguments**

Defendants move for dismissal of Plaintiff's requests for monetary relief against them in their official capacities as well as Plaintiff's state-law claims against them in their official capacities under Rule 12(b)(1) for lack of subject matter jurisdiction.

**1. Monetary Damages in Defendants' Official Capacities**

"A plaintiff may assert § 1983 claims against a public official acting in his individual capacity and in his official capacity." *Baker v. Chisom*, 501 F.3d 920, 923 (8th Cir. 2007); *accord Johnson v. Outboard Marine Corp.*, 172 F.3d 531, 535 (8th Cir. 1999). "A suit against a government official in his or her official capacity is 'another way of pleading an action against an entity of which an officer is an agent.'" *Baker*, 501 F.3d at 925 (quoting *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690 n.55 (1978)); *see Johnson*, 172 F.3d at 535 ("A suit against a public employee in his or her official capacity is merely a suit against the public employer."). Defendants are all employees of MSOP and DHS, an arm of the State of Minnesota. *Daniels v. Jesson*, No. 13-cv-736 (JNE/SER), 2014 WL 3629874, at

7

*5 (D. Minn. July 22, 2014) ("MSOP operates under the auspices of the Minnesota Department of Human Services, which is itself a subdivision of the State of Minnesota.").

"[T]he Eleventh Amendment bars actions, in Federal Court, which seek monetary damages from individual State Officers, in their official capacities, as well as State Agencies, because such lawsuits are essentially for the recovery of money from the state." *King v. Dingle*, 702 F. Supp. 2d 1049, 1069 (D. Minn. 2010) (quotation omitted). Thus, "[t]he Eleventh Amendment protects the State, and the arms of the State, from liability for monetary damages in a Section 1983 action." *Id.*; *see also, e.g.*, *Semler v. Ludeman*, No. 09-cv-0732 (ADM/SRN), 2010 WL 145275, at *7 (D. Minn. Jan. 8, 2010) ("It is well-settled that in a 42 U.S.C. § 1983 action, the Eleventh Amendment precludes an award of money damages against a state official acting in his or her official capacity."). Plaintiff agrees that he cannot seek monetary damages against Defendants in their official capacities. (Pl.'s Resp. at 13.) Accordingly, to the extent Plaintiff seeks monetary damages from Defendants in their official capacities, Plaintiff's claims are barred by the Eleventh Amendment. *See, e.g.*, *Daniels*, 2014 WL 3629874, at *4-6; *Karsjens v. Jesson*, 6 F. Supp. 3d 916, 942 (D. Minn. 2014); *Semler*, 2010 WL 145275, at *6-7.

As Plaintiff notes, however, he also seeks injunctive relief. "A plaintiff may maintain an action against a government official if the complaint seeks only injunctive or prospective relief." *Semler*, 2010 WL 145275, at *7. Declaratory judgments and injunctions are the types "of prospective relief that can be sought in federal court from state officials sued in their official capacities, notwithstanding the state's sovereign immunity."

*Bennie v. Munn*, 822 F.3d 392, 397 (8th Cir. 2016); *accord McDaniel v. Precythe*, 897 F.3d 946, 951-52 (8th Cir. 2018).

Therefore, to the extent Plaintiff seeks monetary damages against Defendants in their official capacities, the Court recommends that such claims be dismissed without prejudice. *See Roth v. United States*, 476 F. App'x 95 (8th Cir. 2012) (per curiam).

### 2. State Constitutional Claims

In his Complaint, Plaintiff has included a number of tandem claims alleging violations of the Minnesota Constitution alongside his § 1983 claims alleging violations of the federal Constitution. (Compl. ¶¶ 66-89.) "The Eleventh Amendment bars federal court jurisdiction over state law claims against unconsenting states or state officials when the state is the real, substantial party in interest, regardless of the remedy sought." *Cooper v. St. Cloud State Univ.*, 226 F.3d 964, 968 (8th Cir. 2000) (citing *Pennhurst v. State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984)). "The Supreme Court has construed the Eleventh Amendment, which by its express terms applies only to actions against states by citizens of other states, to nevertheless also bar suits in federal court against a state by its own citizens." *Minnesota Pharmacists Ass'n v. Pawlenty*, 690 F. Supp. 2d 809, 815 (D. Minn. 2010) (citing *Edelman v. Jordan*, 415 U.S. 651, 662-63 (1974)).

Moreover, "[u]nlike 42 U.S.C. § 1983, Minnesota has no statutory scheme providing for private actions based on violations of the Minnesota constitution." *Riehm v. Engelking*, No. 06-cv-293 (JRT/RLE), 2007 WL 37799, at *8 (D. Minn. Jan. 4, 2007), *affirmed*, 538 F.3d 952 (8th Cir. 2008). Stated differently, "[t]here is no private cause of action for violations of the Minnesota Constitution." *Eggenberger v. West Albany Twp.*,

820 F.3d 938, 941 (8th Cir. 2016) (quotation omitted) (citing cases). Therefore, the Court recommends that all claims based on the Minnesota Constitution be dismissed with prejudice.

### C. Statement of a Claim

The Court now turns to whether Plaintiff has stated claims under § 1983 for violations of his rights under the First, Fourth, and Fourteenth Amendments. "To withstand a Rule 12(b)(6) motion, a complaint must contain sufficient factual allegations to 'state a claim to relief that is plausible on its face.'" *Smithrud v. City of St. Paul*, 746 F.3d 391, 397 (8th Cir. 2014) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). "[A]lthough a complaint need not contain 'detailed factual allegations,' it must contain facts with enough specificity 'to raise a right to relief above the speculative level.'" *United States ex rel. Raynor v. Nat'l Rural Utils. Coop. Fin., Corp.*, 690 F.3d 951, 955 (8th Cir. 2012) (quoting *Twombly*, 550 U.S. at 555). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). Similarly, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* "In deciding a motion to dismiss under Rule 12(b)(6), a court assumes all facts in the complaint to be true and construes all reasonable inferences most favorably to the complainant." *Raynor*, 690 F.3d at 955.

10

"In evaluating whether a pro se plaintiff has asserted sufficient facts to state a claim, [courts] hold a pro se complaint, however inartfully pleaded, to less stringent standards than formal pleadings drafted by lawyers." *Jackson v. Nixon*, 747 F.3d 537, 541 (8th Cir. 2014) (quotation omitted). But, "[a]lthough pro se complaints are to be construed liberally, 'they still must allege sufficient facts to support the claims advanced.'" *Stringer v. St. James R-1 Sch. Dist.*, 446 F.3d 799, 802 (8th Cir. 2006) (quoting *Stone v. Harry*, 364 F.3d 912, 914 (8th Cir. 2004)). Stated differently, "this standard does not excuse pro se complaints from 'alleg[ing] sufficient facts to support the claims advanced.'" *Gerstner v. Sebig, LLC*, 386 F. App'x 573, 575 (8th Cir. 2010) (per curiam) (alteration in original) (quoting *Stone*, 364 F.3d at 914). As the Eighth Circuit Court of Appeals has explained,

> [w]hen we say that a pro se complaint should be given liberal construction, we mean that if the essence of an allegation is discernible, even though it is not pleaded with legal nicety, then the district court should construe the complaint in a way that permits the layperson's claim to be considered within the proper legal framework.

*Stone*, 364 F.3d at 915.

"Section 1983 creates a species of tort liability for the deprivation of any rights, privileges, or immunities secured by the Constitution." *Manuel v. City of Joliet*, 137 S. Ct. 911, 916 (2017) (quotations and citations omitted). "To state a claim under 42 U.S.C. § 1983, a plaintiff must show that he was deprived of a right secured by the Constitution and the laws of the United States and that the deprivation was committed by a person acting under color of state law." *Alexander v. Hedback*, 718 F.3d 762, 765 (8th Cir. 2013); *see* 42 U.S.C. § 1983.

### 1. Official-Capacity Claims

While damages are not allowable against a state official in his or her official capacity under § 1983, the same is not true with respect to declaratory and injunctive relief. *See, e.g.*, *McDaniel*, 897 F.3d at 951-52; *Bennie*, 822 F.3d at 397. Claims seeking declaratory and injunctive relief can be brought against a state official in his or official capacity "because those claims are treated as an action against the official personally and not against the State." *Calzone v. Hawley*, 866 F.3d 866, 872 (8th Cir. 2017) (citing *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 n.10 (1989); *Ex Parte Young*, 209 U.S. 123, 159-60 (1908)); *see also Will*, 491 U.S. at 71 n.10 ("Of course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.'" (quoting *Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985))).

"[T]o establish personal liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right." *Graham*, 473 U.S. at 166. "More is required in an official-capacity action, however, for a governmental entity is liable under § 1983 only when the entity itself is a moving force behind the deprivation . . . ." *Id.* (quotation omitted). "[T]hus, in an official-capacity suit the entity's 'policy or custom' must have played a part in the violation of federal law." *Id.* Defendants assert that, to the extent Plaintiff seeks prospective injunctive relief against them in their official capacities, such claims fail because Plaintiff has not plausibly alleged that an MSOP policy or practice was the moving force behind the alleged constitutional violations.

12

"To establish liability in an official-capacity suit under section 1983, a plaintiff must show either that the official named in the suit took an action pursuant to an unconstitutional governmental policy or custom, or that he or she possessed final authority over the subject matter at issue and used that authority in an unconstitutional manner." *Nix v. Norman*, 879 F.2d 429, 433 (8th Cir. 1989) (citation omitted); *accord Raymond v. Bd. of Regents of Univ. of Minn.*, 140 F. Supp. 3d 807, 814 (D. Minn. 2015); *Daywitt v. Minnesota*, No. 14-cv-4526 (MJD/LIB), 2015 WL 4094199, at *12 (D. Minn. July 6, 2015). "A governmental policy involves a deliberate choice to follow a course of action made from among various alternatives by an official who has the final authority to establish governmental policy." *Brockinton v. City of Sherwood*, 503 F.3d 667, 674 (8th Cir. 2007) (quotation omitted). "A governmental custom involves a pattern of persistent and widespread practices which become so permanent and well settled as to have the effect and force of law." *Id.* (quotation omitted).

While Plaintiff has included boilerplate language in the Complaint that Defendants acted pursuant to some sort of policy, (*see, e.g.*, Compl. ¶¶ 9, 10, 69, 75, 81, 87), Plaintiff has not identified the particular policy Defendants purportedly acted in accordance with. Plaintiff has not alleged that the purported retaliation resulted from any official MSOP policy authorizing such retaliation. Moreover, with respect to the one policy Plaintiff does identify, MSOP Policy 415-5085 (governing use of the High Security Area ("HSA")), Plaintiff does not allege that the policy itself is unconstitutional, but that Defendants did not act in accordance with it. (*See, e.g.*, Compl. ¶¶ 34, 42, 48.) Thus, as Defendants point out, Plaintiff "does not take issue with actual MSOP polices and procedures," but "with the

conduct of certain individuals in a series of interactions and conversations with [him]."
(Defs.' Mem. in Supp. at 6-7, ECF No. 25.)

Nor has Plaintiff pleaded facts from which it can be reasonably inferred that any custom played a part in the alleged constitutional violations. "Custom" liability requires:

> (1) the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; (2) deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and (3) that plaintiff was injured by acts pursuant to the governmental entity's custom, i.e., that the custom was a moving force behind the constitutional violation.

*Snider v. City of Cape Girardeau*, 752 F.3d 1149, 1160 (8th Cir. 2014). As will be discussed in greater detail below, Plaintiff alleges that he was subjected to numerous adverse actions by various MSOP employees in response to the filing of the ID Lawsuit. In response to Defendants' motion to dismiss, Plaintiff describes these adverse actions as showing "those in the MSOP acting in unison as a 'moving force' to intimidate, defame, isolate, and deprive [him] of his constitutional rights." (Pl.'s Resp. at 3.)

Again as will be discussed in greater detail below, Plaintiff has failed to plead facts from which it can be reasonably inferred that most of the actions complained of were motivated at least in part by the filing of the ID Lawsuit. While the Court has assumed the truth of Plaintiff's allegations for the purposes of the instant motion, it is speculative to conclude that such actions were part of a pattern of retaliation in the absence of facts connecting most of them to the filing of the ID Lawsuit. Further, the pattern of alleged constitutional conduct must be sufficiently widespread "to constitute a custom or usage

14

with the force of law." *Kelly v. City of Omaha*, 813 F.3d 1070, 1076 (8th Cir. 2016).  While

Plaintiff has alleged that he was retaliated against by various MSOP employees in response

to the filing of a particular lawsuit, Plaintiff has not alleged that other MSOP clients were

retaliated against in response to filing litigation.  *See id.*; *Ware v. Jackson Cty.*, 150 F.3d

873, 881-82 (8th Cir. 1998).  As such, Plaintiff has failed to plead facts from which it can

be reasonably inferred that a custom of retaliation was the moving force behind the alleged

constitutional violations in this case.

Plaintiff offered nothing more than conclusory allegations as to the existence of a

policy or custom.  Because Plaintiff has not pleaded sufficient facts showing that the

alleged acts were committed according to a policy or custom, the Court recommends that

Plaintiff's official-capacity claims be dismissed without prejudice in their entirety as to all

Defendants.

### 2.  Constitutional Claims

#### a.  First Amendment

Plaintiff alleges Defendants have violated his rights under the First Amendment by

(i) retaliating against him for filing the ID Lawsuit; (ii) infringing his religious freedom;

and (iii) defaming him through false behavior reports.

#### i.  Retaliation for Filing Lawsuit

"It is well established that the right to file a legal action is protected under the First

Amendment."  *Spencer v. Jackson Cty. Mo.*, 738 F.3d 907, 911 (8th Cir. 2013); *see*

*Evenstad v. Herberg*, 994 F. Supp. 2d 995, 1001 (D. Minn. 2014) ("[C]ivilly committed

persons retain their First Amendment Rights to exercise the freedom of speech and to seek redress of grievances.").

> To establish a § 1983 claim for retaliation in violation of the First Amendment, a plaintiff must allege (1) that he engaged in a protected activity, (2) that the defendants responded with adverse action that would chill a person of ordinary firmness from continuing in the activity, and (3) that the adverse action was motivated at least in part by the exercise of the protected activity.

*Beaulieu v. Ludeman*, 690 F.3d 1017, 1025 (8th Cir. 2012) (quotation omitted); *see Benson v. Piper*, No. 16-cv-509 (DWF/TNL), 2016 U.S. Dist. LEXIS 190502, at *16 (D. Minn. Dec. 8, 2016), *adopting report and recommendation as modified*, 2017 U.S. Dist. LEXIS 158017 (D. Minn. Mar. 31, 2017) [hereinafter *Benson II*]; *Evenstad*, 994 F. Supp. 2d at 1000; *see also Banks v. Ludeman*, No. 08-cv-5792 (MJD/JJK), 2010 WL 4822892, at *16 (D. Minn. Oct. 4, 2010) (applying three-prong test for prison retaliatory discipline claim to retaliation claim brought by MSOP client), *adopting report and recommendation*, 2010 WL 4822888 (D. Minn. Nov. 22, 2010).

"The retaliatory conduct itself need not be a constitutional violation; the violation is acting in retaliation for the exercise of a constitutionally protected right." *Spencer*, 738 F.3d at 911 (quotation omitted). Thus, "[i]n order to be actionable, a defendant's conduct need not be egregious; petty harassment and ridicule, for example, may suffice." *Evenstad*, 994 F. Supp. 2d at 1001. Defendants assert Plaintiff has failed to plead a claim of First Amendment retaliation because he not alleged sufficient facts linking the alleged acts to the ID Lawsuit or some other retaliatory motive and some of the conduct complained of

"would not have prevented a person of 'ordinary firmness' from engaging in protected activity."  (Defs.' Mem. in Supp. at 11.)

### *McGowan, Kosloski, & Gordon*

Plaintiff alleges that, on June 26, 2016, McGowan wrote a false report that he was in another client's cell and called McGowan derogatory names.  (Compl. ¶¶ 13-14.)  Kosloski approved the report.  (Compl. ¶ 13.)  McGowan and Kosloski are both named as defendants in the ID Lawsuit.  Plaintiff alleges that the false report came within "moments" of McGowan being served with the ID Lawsuit; McGowan's assignment in Plaintiff's unit that day was "unusual" and "particularly peculiar" as McGowan "was not typically assigned" to his unit; and her "animus and disdain" of Plaintiff is "known" and "has been well documented."  (Compl. ¶ 13.)  Plaintiff alleges that "McGowan was taunting [him] with statements about the [ID Lawsuit] and stated 'who the hell do you think you are, *we'll* make your life hell.'"  (Compl. ¶ 13.)  Plaintiff alleges that, despite efforts of other MSOP staff, "McGowan continued to glare at [him], shaking with rage trying to goad [him] into a physical altercation."  (Compl. ¶ 13.)

In another incident, Plaintiff alleges that, on July 14, 2016, Gordon prevented him from going to a scheduled therapy class, stating that Gordon "pointed at [him] and menacingly stated 'got you again.'"  (Compl. ¶ 18.)

The following day, Gordon and Kosloski were involved in a lengthy "unwarranted and unsanctioned" search of Plaintiff's room.  (Compl. ¶ 19.)  During the room search, which lasted approximately six hours, shampoo and toothpaste were emptied "into plastic bags," dirty clothes were mixed with clean cloths, and Plaintiff's "legalese [sic] and

correspondence" were combined.  (Compl. ¶ 19.)  Afterwards, Kosloski told Plaintiff "he could return to his [room] (laughing)."  (Compl. ¶ 19.)  "Gordon told Plaintiff he knew what he could do to make it stop, and said, 'happy birthday.'"  (Compl. ¶ 19.)

On November 18, "Gordon falsely reported that . . . Plaintiff was trying to incite a riot" by yelling, in derogatory terms, that another client was assaulting a guard.  (Compl. ¶ 23.)  According to Plaintiff, "[t]his is a deliberate lie and mischaracterization of the dialog" that occurred.  (Compl. ¶ 23.)  Plaintiff states that a fight had broken out in another unit and Plaintiff witnessed another client "assaulting a guard" during the fight.  (Compl. ¶ 23.)  As Plaintiff passed other clients in the hall, they "angrily assum[ed]" that he was responsible for them having to wait in the hallway until the situation resolved.  (Compl. ¶ 23.)  Other clients "were shouting at . . . Plaintiff and Plaintiff yell back, 'it isn't me, [name redacted] is fighting with the guards.'"  (Compl. ¶ 16.)  Gordon "seized on the opportunity to claim this was inciting a riot," and misreported what Plaintiff actually said.  (Compl. ¶ 23.)  Kosloski approved the report, and Moser "approved the determination" leading to "more special punishments."  (Compl. ¶ 23.)

Plaintiff also alleges that "Kosloski has hinted (talking in the third person) that by provoking . . . [him] into criminal behavior he will be charged 'like past clients' and sent to prison, which will minimize or make 'all the problems (complaint) he creates will go away.'"  (Compl. ¶ 21.)  In addition, Kosloski was involved in three allegedly unjustified behavioral reports written against Plaintiff for using the shower, microwave, and unit computer, things other MSOP clients are allowed to do.  (Compl. ¶¶ 39, 40, 41.)

The Court concludes that Plaintiff has plausibly alleged First Amendment retaliation claims against McGowan and Kosloski. McGowan and Kosloski were both named in the ID Lawsuit. It can be reasonably inferred from their comments that they singled Plaintiff out because he filed the ID Lawsuit, and that their conduct was motivated at least in part because of Plaintiff's exercise of his First Amendment rights. *See Peterson v. Kopp*, 754 F.3d 594, 602 (8th Cir. 2014) ("[T]he plaintiff must show he was singled out because of his exercise of constitutional rights." (quotation omitted)); *Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004) (statement by state psychiatrist to civilly committed individual that "he would not be recommended for step-level increases if he kept filing baseless grievances" could permit inference that state psychiatrist denied privileges in retaliation for filing grievances); *see also McCauley v. Dormire*, 245 F. App'x 565, 567 (8th Cir. 2007) (per curiam) (inmate stated retaliatory-discipline claim based on "allegations that defendants made statements suggesting a retaliatory motive, that they knew he had not committed the rule infraction, and that the [disciplinary] conviction was not supported by 'some evidence'").

The Court recognizes that civilly committed individuals like Plaintiff are not prisoners. In analyzing claims for First Amendment retaliation brought by civilly committed individuals at MSOP, however, the Eighth Circuit has looked to the prison context. *See, e.g.*, *Beaulieu*, 690 F. 3d at 1025; *Senty-Haugen v. Goodno*, 462 F.3d 876, 890 (8th Cir. 2006). In the prison context, the Eighth Circuit has held "a threat of retaliation is sufficient injury if made in retaliation for an inmate's use of prison grievance procedures." *Burgess v. Moore*, 39 F.3d 216, 218 (8th Cir. 1994). The Eighth Circuit has

similarly found that allegations of false disciplinary proceedings being initiated in response to prison grievances and complaints of mistreatment, threats to limit privileges, and harassment stated an actionable retaliation claim. *Williams v. Silvey*, 375 F. App'x 648, 649-50 (8th Cir. 2010); *see McCauley*, 245 F. App'x at 567; *Evenstad*, 994 F. Supp. 2d at 1001 (adverse actions included "fabricating infractions to justify putting [MSOP client] in [protective isolation]"). Denial of privileges may also constitute an adverse action showing retaliation. *Spencer*, 738 F.3d at 911 (citing *Revels*, 382 F.3d at 876). McGowan and Kosloski were each involved in behavioral reports written against Plaintiff that were either false or for behavior other MSOP clients were allowed to engage in, such as taking a shower or using the microwave. As a result of these reports, Plaintiff suffered disciplinary consequences. Taking Plaintiff's allegations as true, Plaintiff has stated an actionable retaliation claim against McGowan and Kosloski.

The Court concludes, however, that Plaintiff has not stated a retaliation claim against Gordon. Gordon was not named in the ID Lawsuit. Plaintiff has not alleged facts from which it can reasonably be inferred that Gordon was somehow connected to the ID Lawsuit, or that his actions were motivated by its filing. *See Atkinson v. Bohn*, 91 F.3d 1127, 1129 (8th Cir. 1996) (per curiam); *Daywitt*, 2015 WL 4094199, at *6. And, while two of the incidents also involved Kosloski, Plaintiff has not alleged any facts that Kosloski incited Gordon to retaliate against Plaintiff for filing the ID Lawsuit. *See Williams*, 375 F. App'x 648 at 649. A First Amendment retaliation claim requires a plaintiff to "show the official took the adverse action because the plaintiff engaged in the protected speech." *Revels*, 382 F.3d at 876. Without some sort of factual context connecting Gordon to the

20

ID Lawsuit, it is simply too speculative to attribute Gordon's statement that Plaintiff "knew what he could do to make it stop" to the ID Lawsuit and Plaintiff's exercise of his First Amendment rights. Plaintiff has failed to plead sufficient facts from which it can be reasonably inferred that any adverse action taken by Gordon was motivated at least in part by any protected activity as opposed to some other motive.

### Other Behavioral Reports

Plaintiff identifies other instances in which allegedly unjustified behavioral reports were written against him for doing things other MSOP clients were allowed to do, such as using the gym (Compl. ¶¶ 15, 27); being in the yard (Compl. ¶ 16); using the sink and microwave (Compl. ¶¶ 28, 32, 40); having the door to his room open (Compl. ¶ 29); walking in the hallway (Compl. ¶ 30; *see also* Compl. ¶ 33); using the shower (Compl. ¶ 39); and using the unit computer (Compl. ¶ 41). Another behavioral report was written against Plaintiff stating "he would no longer be allowed to have breaks from punishment." (Compl. ¶ 31.) Plaintiff alleges that these behavioral reports amounted to "special punishment." (Compl. ¶¶ 15, 16, 28, 30; *see* Compl. ¶¶ 27, 29, 31, 32, 33, 39.)

But, like Gordon, many of the defendants Plaintiff alleges were involved in these reports were not named in the ID Lawsuit, and Plaintiff has not alleged facts somehow connecting them with that lawsuit or showing that their actions were motivated by its filing. *See Revels*, 382 F.3d at 876; *Daywitt*, 2015 WL 4094199, at *6. In opposing Defendants' motion, Plaintiff contends that "[t]he point of the spear (the McGowan report) was trailed by numerous reports in which Defendants as a force started to enforce punishments on . . . [him] without any due process." (Pl.'s Resp. at 9.) Plaintiff has not, however, pleaded

facts from which it can be reasonably inferred that these defendants acted at the behest of McGowan or someone otherwise affected by the ID Lawsuit. *See Williams*, 375 F. App'x 648 at 649. Plaintiff has failed to plead sufficient facts that any adverse action taken by these defendants was motivated at least in part by protected activity. Accordingly, Plaintiff has failed to state a retaliation claim against Fahland (Compl. ¶¶ 15, 16, 30, 31); Sayovitz (Compl. ¶¶ 15, 16, 23, 27, 29, 31, 32, 33, 39, 40, 41); Osborne (Compl. ¶¶ 15, 16); Moser (Compl. ¶¶ 15, 16, 23, 27, 29, 31, 32, 33, 39, 40, 41); Michelizzi (Compl. ¶ 16); Sadjak (Compl. ¶¶ 19); Vaineo (Compl. ¶¶ 23, 27, 29, 31, 32, 33, 39, 40, 41); Huhta (Compl. ¶ 27); Ninneman (Compl. ¶¶ 27, 28, 33); Shorter (Compl. ¶¶ 28, 32, 33, 39); Giersdorf (Compl. ¶¶ 29, 40, 41); Carey (Compl. ¶¶ 29, 32, 40, 41); and Rose (Compl. ¶ 39).

Lastly, three of the defendants who were involved in these reports were also named in the ID Lawsuit: Randa (Compl. ¶ 15); Benoit (Compl. ¶¶ 15, 16, 23, 27, 29, 31, 32, 33); and Gresczyk (Compl. ¶¶ 30, 31). While the Court has been able to determine that Randa, Benoit, and Gresczyk were named in the ID Lawsuit by examining the complaint in that case, Plaintiff has pleaded no facts connecting Randa, Benoit, and Gresczyk to the ID Lawsuit like he did with McGowan. And, unlike McGowan and Kosloski who made comments either directly or indirectly referencing the ID Lawsuit during their interactions with Plaintiff, Plaintiff has not alleged facts from which it could be inferred that the actions of Randa, Benoit, and Gresczyk were motivated at least in part by the ID Lawsuit. *See Revels*, 382 F.3d at 876; *Daywitt*, 2015 WL 4094199, at *6. "Federal courts are not required to 'assume facts that are not alleged just because an additional factual allegation would have formed a stronger complaint.'" *Wickner v. Collelo*, No. 11-cv-3448

(DWF/JJK), 2011 WL 6960975, at *1 (D. Minn. Dec. 14, 2011) (quoting *Stone*, 364 F.3d

at 915), *adopting report and recommendation*, 2012 WL 32940 (D. Minn. Jan. 6, 2012).

Nor has Plaintiff pleaded facts from which it can be reasonably inferred that Randa, Benoit,

and Gresczyk acted at the behest of McGowan or someone otherwise affected by the ID

Lawsuit. *See Williams*, 375 F. App'x 648 at 649. Without any facts suggesting the adverse

actions taken by Randa, Benoit, and Gresczyk were motivated at least in part by protected

activity, Plaintiff has likewise failed to state a retaliation against them.[4]

### Qualified Immunity

Having concluded that Plaintiff has stated a claim for First Amendment retaliation

against McGowan and Kosloski, the Court turns to Defendants' qualified-immunity

argument. "In claims brought under 42 U.S.C. § 1983, 'qualified immunity shields

government officials from liability and the burdens of litigation unless their conduct

violated a clearly established constitutional or statutory right of which a reasonable official

---

[4] In Paragraph 21, Plaintiff alleges that Kosloski, Randa, Wyatt, Shorter, Gresczyk, and Giersdorf engaged in a number of activities designed to target and harass him in response to the filing of the ID Lawsuit. (Compl. ¶ 21.) Plaintiff alleges that these Defendants "have embarked on a campaign to provoke and try to incite [him] into any kind of threatening or physical behavior," including "initiating condescending behaviors and language with racial overtones, nine unwarranted room searches, fixating or staring at [him] as well as hovering around . . . [him] when he is sitting down." (Compl. ¶ 21.) Plaintiff additionally alleges that these "Defendants have been disrupting and failing to answer all formal requests *i.e. mail slips, dental and health services passes, dietary services, vocational services.*" (Compl. ¶ 21.) And, as discussed above, Kosloski made a comment inferring that Plaintiff could be sent away to prison, which would make his complaints go away. (Compl. ¶ 21.)

The Court has construed Kosloski's comment along with Plaintiff's other allegations of adverse action by Kosloski. As for the other acts listed in Paragraph 21, "[c]onstitutional claims brought under 42 U.S.C. § 1983 are discrete claims and as such should not be pled in . . . [a] shotgun manner." *Liggins v. Morris*, 749 F. Supp. 967, 971 (D. Minn. 1990). This type of approach "unfairly burden[s] defendants and courts" by "shift[ing] onto the defendant and the court the burden of identifying the plaintiff's genuine claims and determining which of those claims might have legal support." *Gurman v. Metro Hous. & Redevelopment Auth.*, 842 F. Supp. 2d 1151, 1153 (D. Minn. 2011). Plaintiff's "shotgun" approach has made it impossible for the Court to tell what precisely occurred and who was involved. Accordingly, with the exception of Kosloski's comment, the Court has not considered any of the other acts complained of in its analysis. In any event, except for Kosloski, the Court has determined that Plaintiff has failed to allege sufficient facts suggesting that adverse actions taken by Randa, Shorter, Gresczyk, and Giersdorf were motivated at least in part by protected activity. The same analysis applies with equal force to Wyatt, who was also not named in the ID Lawsuit.

23

would have known.'" *Schoettle v. Jefferson Cty.*, 788 F.3d 855, 858 (8th Cir. 2015) (quoting *Carpenter v. Gage*, 686 F.3d 644, 648 (8th Cir. 2012)); *accord Keil v. Triveline*, 661 F.3d 981, 985 (8th Cir. 2011) ("Qualified immunity shields public officials from civil lawsuits when their conduct does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982))).  In determining whether a government official is entitled to qualified immunity, courts consider "(1) whether the facts alleged, construed in the light most favorable to [the plaintiff], establish a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the alleged violation, such that a reasonable official would have known that her actions were unlawful." *Keil*, 661 F.3d at 985 (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)).  "If the answer to either question is no, then the [officials] are entitled to qualified immunity." *Id.* (citing *Pearson*, 555 U.S. at 236).

"A Rule 12(b)(6) dismissal based on qualified immunity is appropriate when the immunity is established on the face of the complaint." *Dornheim v. Sholes*, 430 F.3d 919, 926 (8th Cir. 2005) (quotation omitted); *accord Stanley v. Finnegan*, 899 F.3d 623, 627 (8th Cir. 2018); *Hafley v. Lohman*, 90 F.3d 264, 266 (8th Cir. 1996).  "A court considers whether the plaintiff has stated a plausible claim for violation of a constitutional or statutory right and whether the right was clearly established at the time of the alleged infraction." *Hager v. Ark. Dep't of Health*, 735 F.3d 1009, 1013 (8th Cir. 2013); *see Hafley*, 90 F.3d at 266 (public officials "are entitled to qualified immunity unless [the plaintiff] has alleged the violation of a constitutional right that was clearly established at

the time of the alleged violation").  "In determining whether the legal right at issue is clearly established, [the Eighth C]ircuit applies a flexible standard, requiring some, but not precise factual correspondence with precedent, and demanding that officials apply general, well-developed legal principles."  *Stoner v. Watlingten*, 735 F.3d 799, 803 (8th Cir. 2013).

The Eighth Circuit has held that "[i]t is well established that the right to file a legal action is protected under the First Amendment."  *Spencer*, 738 F.3d at 911; *see Evenstad*, 994 F. Supp. 2d at 1001.  And, as stated above, the Eighth Circuit has looked to the prison content when analyzing claims for First Amendment retaliation brought by civilly committed individuals at MSOP.  In *Beaulieu*, the Eighth Circuit "observed that prison officials are prohibited from 'punish[ing] an inmate because he exercises his constitutional right of access to the courts.'"  690 F.3d at 1025 (quoting *Sisneros v. Nix*, 95 F.3d 749, 751 (8th Cir. 1996)); *see Senty-Haugen*, 462 F.3d at 890.  The Eighth Circuit has similarly stated that

> A prisoner's right under the First Amendment to petition for redress of grievances under a prison's grievance procedures is clearly established in this court.  Similarly, it has for over twenty years been the law of this circuit that actions taken in retaliation for an inmate's filing of a grievance are actionable under 42 U.S.C. § 1983.  The right to be free from retaliation for availing one's self of the prison grievance process is also clearly established in other circuits.

*Nelson v. Shuffman*, 603 F.3d 439, 449-50 (8th Cir. 2010) (citations omitted)).

Plaintiff has a clearly established right to file a lawsuit under the First Amendment and a reasonable official in the shoes of McGowan and Kosloski would have known that it was unlawful to retaliate against Plaintiff for exercising his First Amendment rights.

Therefore, McGowan and Kosloski are not entitled to qualified immunity on Plaintiff's retaliation claims.

### ii.    Free Exercise of Religion

Plaintiff alleges that his religious freedom was infringed when he was removed from one Native American ceremony and written up for attending two others. Defendants contend that Plaintiff has not alleged a substantial burden on his ability to practice his religion.

#### *July 17 Sweat Lodge Ceremony*

Plaintiff is on a list of MSOP clients allowed to participate in Native American ceremonies. (Compl. ¶ 20.) Gordon removed Plaintiff from a sweat lodge ceremony on July 17, 2016, stating that Plaintiff "was not on the approved list of clients allowed to attend the [c]eremony." (Compl. ¶ 20.) When the list was checked the following day, "Plaintiff's name was on the list and Plaintiff was told 'we made a mistake.'" (Compl. ¶ 20.) Plaintiff alleges that Gordon "refused to allow anyone to double check the . . . list while the [c]eremony was going on, ensuring [he] would be removed from the [c]eremony." (Compl. ¶ 14.)

#### *December 3 Sunrise Ceremony*

Wyatt wrote a behavioral report against Plaintiff on December 3, 2016, when he attended "a Native American 'sunrise ceremony' as part of his spirituality." (Compl. ¶ 25.) Ninneman approved the report. (Compl. ¶ 25.) "Other clients similarly situated were allowed to participate in the ceremony, Plaintiff was singled out and targeted." (Compl.

¶ 25.)  "[T]he BEU Defendants[5] refused to acknowledge Plaintiff's right to his spiritual practices and stated the denial of religious programming was part of the special punishments," and "imposed more punishments targeting . . . Plaintiff for retaliation purposes."  (Compl. ¶ 25.)

### December 4 Sweat Lodge Ceremony

Koecher wrote a behavioral report against Plaintiff when he attended a Native American sweat lodge ceremony on or about December 4, 2016 "as part of his spirituality." (Compl. ¶ 26.)  Ninneman approved the report.  (Compl. ¶ 26.)  "[T]he BEU Defendants refused to recognize . . . Plaintiff's right to his religion," and "refused to identify or accept as evidence that other clients were allowed to participate in the ceremony and . . . Plaintiff was targeted and treated differently."  (Compl. ¶ 26.)  "The BEU Defendants sanctioned more punishments targeting Plaintiff for retaliation purposes."  (Compl. ¶ 26.)

"In order to succeed on a claim under the Free Exercise Clause of the First Amendment, Plaintiff[] must establish that Defendants' challenged . . . practices place a 'substantial burden' on [his] ability to practice [his] religion."  *Karsjens v. Piper*, 336 F. Supp. 3d 974, 991 (D. Minn. 2018) (citing *Patel v. United States Bureau of Prisons*, 515 F.3d 807, 813 (8th Cir. 2008); *Weir v. Nix*, 114 F.3d 817, 820 (8th Cir. 1997)).

> To find a substantial burden, the court must determine that the challenged practices: (1) "significantly inhibit or constrain conduct or expression that manifests some central tenet of a person's individual religious beliefs"; (2) "meaningfully curtail a person's ability to express adherence to his or her

---

5 "BEU" stands for the "Behavioral Expectations Unit."  (Compl. ¶ 10(d).)  It appears O'Conner, Sayovitz, and Osbourne "are part of" the BEU.  (Compl. ¶ 14.)  It is not clear from the Complaint, however, who all is included in the "BEU Defendants."

faith"; or (3) "deny a person reasonable opportunities to engage
in those activities that are fundamental to a person's religion."

*Karsjens*, 336 F. Supp. 3d at 991 (quoting *Patel*, 515 F.3d at 813) (citation omitted).

Plaintiff has not pleaded facts from which it could be reasonably inferred that these three incidents substantially burdened Plaintiff's ability to practice his Native American "spirituality." (Compl. ¶¶ 25, 26.) Plaintiff has not alleged that these incidents significantly inhibited or constrained conduct or expression central to his religious beliefs or that they meaningfully curtailed his ability to express adherence to his religious beliefs. The Complaint contains no description of Plaintiff's religious beliefs and how attendance at these ceremonies is central to those beliefs. Moreover, Plaintiff has not alleged that he was without reasonable opportunities to engage in activities fundamental to his religious beliefs. Nor has Plaintiff alleged that he was punished each time he tried to adhere to his religious beliefs. *See Mueller v. Mesojedec*, No. 16-cv-277 (JNE/TNL), 2017 WL 764866, at *5 (D. Minn. Jan. 6, 2017) ("[P]olicies that put confined persons to the choice of adhering to their religious beliefs or facing serious disciplinary action substantially burden religious exercise." (citing *Holt v. Hobbs*, 135 S. Ct. 853, 862 (2015))), *adopting report and recommendation*, 2017 WL 758929 (D. Minn. Feb. 27, 2017). Because Plaintiff has not alleged facts plausibly establishing that his religious exercise was substantially burdened, the Court recommends that Plaintiff's free-exercise claim be dismissed in its entirety as to all Defendants.[6]

---

[6] It is somewhat difficult to parse whether Plaintiff is asserting a separate free exercise claim under the First Amendment based on these three incidents, that these three incidents are additional instances of First Amendment retaliation based on the filing of the ID Lawsuit, or both. To the extent that Plaintiff's Complaint can also be read as asserting a First Amendment retaliation claim based on these three incidents, such claims fail for the reasons

### iii.    Defamation

Plaintiff alleges that he "has been defamed with falsely inflammatory published statements" in behavioral reports.  (Compl. ¶ 10(c).)  Defendants move for dismissal of any defamation claims premised on the First Amendment as "[t]he First Amendment contains no right to be free from defamation."  (Defs.' Mem. in Supp. at 8.)

### *False Reports*

Plaintiff alleges that, on June 26, 2016, McGowan falsely reported that Plaintiff was in another client's room and had called her derogatory names.  (Compl. ¶ 13.)  Plaintiff alleges that, on November 18, 2016, Gordon falsely reported that Plaintiff was inciting a riot, "deliberate[ly] ly[ing] and mischaracteriz[ing] . . . the dialog" that occurred.  (Compl. ¶ 23.)  Kosloski approved the report and Moser "approved the determination" leading to "more special punishments."  (Compl. ¶ 23.)  Plaintiff also alleges that the following Defendants falsely accused him of exhibiting dangerous and uncontrollable behavior in various reports in connection with his confinement in the HSA between December 6 and 8, 2016: Gianinni (Compl. ¶¶ 35, 43); Fischer (Compl. ¶¶ 35, 42, 43); Johnson (Compl.

---

stated above.  *See supra* Section III.C.2.a.i.  Of the Defendants implicated in these three incidents, only Benoit (Compl. ¶¶ 25, 26) was involved in the ID Lawsuit.  Again, only by examining the complaint in the ID Lawsuit was the Court able to determine that Benoit was named.  Plaintiff has pleaded no facts connecting Benoit to the ID Lawsuit; no facts from which it could be inferred that Benoit's actions were motivated at least in part by the ID Lawsuit; and no facts that Benoit was acting at the behest of McGowan or someone else otherwise affected by the ID Lawsuit.  *See Williams*, 375 F. App'x 648 at 649; *Revels*, 382 F.3d at 876; *Daywitt*, 2015 WL 4094199, at *6. Gordon (Compl. ¶ 20); Wyatt (Compl. ¶ 25); Ninneman (Compl.¶¶ 25, 26); Sayovitz (Compl. ¶¶ 25, 26); Vaineo (Compl. ¶¶ 25, 26); Moser (Compl. ¶¶ 25, 26); and Koecher (Compl. ¶ 26) were not involved in the ID Lawsuit. Plaintiff has pleaded no facts connecting these defendants to the ID Lawsuit; no facts from which it could be inferred that the actions of these defendants were motivated at least in part by the ID Lawsuit; and no facts that these defendants were acting at the behest of McGowan or someone else otherwise affected by the ID Lawsuit.  *See Williams*, 375 F. App'x 648 at 649; *Revels*, 382 F.3d at 876; *Daywitt*, 2015 WL 4094199, at *6.  Without any facts suggesting that the adverse actions taken by Benoit, Gordon, Wyatt, Ninneman, Sayovitz, Vaineo, Moser, and Koecher were motivated at least in part by protected activity, Plaintiff has failed to state a claim for First Amendment retaliation against them.

¶ 35); Brindamor (Compl. ¶ 36); Aldrin (Compl. ¶ 36); Lind (Compl. ¶ 36); Shorter (Compl. ¶ 42); Cowell (Compl. ¶ 43); Cellelo (Compl. ¶ 44); and Beavens (Compl. ¶ 44).

### First Amendment

"[T]he First Amendment does not provide a cause of action for defamation." *Blackstock v. Miller*, No. 4:17-cv-01926-RBH-KDW, 2017 WL 3530525, at *1 (D. S.C. July 28, 2017) (citing cases), *adopting report and recommendation*, 2017 WL 3500219 (D. S.C. Aug. 16, 2017); *see also Siegert v. Gilley*, 500 U.S. 226, 233 (1991) ("Defamation, by itself, is a tort actionable under the laws of most States, but not a constitutional deprivation"); *Vega v. Lantz*, 596 F.3d 77, 81 (2d Cir. 2010) ("Generally, defamation is an issue of state, not of federal constitutional, law."); *Malmstrom v. Utah*, No. 1:17-CV-80-DN-EJF, 2018 WL 774119, at *3 (D. Utah Jan. 12, 2018) ("Defamation and First Amendment violations represent two separate causes of action. Simply because the First Amendment's protections fail to extend to a particular action, such as defamation, does not mean that action violates the First Amendment."), *adopting report and recommendation sub nom.*, *Malmstrom v. State of Utah Dep't of Children & Families*, 2018 WL 774083 (D. Utah Feb. 7, 2018).

### Fourteenth Amendment

While defamation is not actionable under the First Amendment, "under limited circumstances, federal constitutional relief is available for defamation committed by government officials." *Vega*, 596 F.3d at 81; *see Paul v. Davis*, 424 U.S. 693, 701-12 (1976). "In *Paul v. Davis*, the Supreme Court made clear that injury to reputation alone is not sufficient to state a § 1983 claim." *Jones v. McNeese*, 746 F.3d 887, 898 (8th Cir.

2014) (citing 424 U.S. 693). "[A]n action can be grounded in 42 U.S.C. § 1983 when th[e] plaintiff can demonstrate a stigmatizing statement plus a deprivation of a tangible interest." *Vega*, 596 F.3d at 81 (quotation omitted); *see Beley v. City of Chicago*, 901 F.3d 823, 828 n.5 (7th Cir. 2018) ("'Reputational harm' is not a cognizable liberty interest unless it is accompanied by an alteration in legal status or rights." (citing *Paul*, 424 U.S. at 712)). "For a defamatory statement to be actionable under § 1983, it must . . . damage a person's standing in the community or foreclose a person's freedom to take advantage of other employment opportunities." *Jones*, 746 F.3d at 898 (quotation omitted).

Ultimately, as best as this Court is able to tell, Plaintiff's allegations are not based on any stigma imposed or harm to his reputation as a result of the allegedly false statements. As stated in the following section, Plaintiff has not alleged any harm or effect on his reputation based on the allegedly false statements. To the extent Plaintiff alleges that he was unlawfully punished or confined as a result of the allegedly false statements, the Court will address such allegations in connection with Plaintiff's due process claims below. *See infra* Section III.C.2.c.

### State Law

To the extent Plaintiff's Complaint could be read as asserting a defamation claim under Minnesota common law, "[t]he common law claim of defamation at civil law sought to redress those injuries to reputation caused by the publication of false information damaging to another's reputation." *Moreno v. Crookston Times Printing Co.*, 610 N.W.2d 321, 327-28 (Minn. 2000) (footnote omitted). "[D]efamation focuses on injury to reputation." *Richie v. Paramount Pictures Corp.*, 544 N.W.2d 21, 28 (Minn. 1996*); see*

31

*also id.* ("This court has consistently acknowledged that the purpose of a defamation action is to "compensate private individuals for wrongful injury to reputation." (quotation omitted)).

> Under Minnesota law, a plaintiff must prove three elements to establish a defamation claim: "(1) the defamatory statement is communicated to someone other than the plaintiff, (2) the statement is false, and (3) the statement tends to harm the plaintiff's reputation and to lower the plaintiff in the estimation of the community."

*Elkharwily v. Mayo Holding Co.*, 823 F.3d 462, 468 (8th Cir. 2016) (quoting *Bahr v. Boise Cascade Corp.*, 766 N.W.2d 910, 919-20 (Minn. 2009)). While Plaintiff has alleged that false statements were made that he engaged in certain behavior and those statements were communicated to others in various reports and disciplinary proceedings, Plaintiff has not alleged facts that he suffered any reputational harm as a result of the allegedly false statements. *See Saffari v. St. Cloud State Univ.*, No. 13-cv-30 (MJD/LIB), 2014 WL 3955719, at *19 (D. Minn. Aug. 13, 2014); *Kristensen v. Greatbatch*, No. 11-cv-3318 (MJD/TNL), 2012 WL 4479244, at *6 (D. Minn. Sept. 28, 2012); *Hern v. Bankers Life. Cas. Co.*, 133 F. Supp. 2d 1130, 1136 (D. Minn. 2001).

Based on the foregoing, Plaintiff has failed to state a claim for defamation, and the Court recommends that any defamation claim be dismissed in its entirety as to all Defendants.

### b. Fourth Amendment

The Fourth Amendment generally protects "against unreasonable searches and seizures." U.S. Const. amend. IV. Plaintiff alleges that he was subject to an unreasonable

room search and strip searches before being placed in the HSA.  Plaintiff also alleges that

he was subject to unreasonable "seizures" based on certain privileges being taken away

from him and his placement in the HSA and transfer to the Omega Two unit.  The Court

has endeavored to consider Plaintiff's search and seizure claims within the proper legal

framework in light of his pro se status.  *See Stone*, 364 F.3d at 915.

### i.  Searches

As best as the Court is able to tell, Plaintiff challenges three searches: one search of

his room[7] and two strip searches, also known as unclothed visual body searches, before he

was placed in the HSA.  Defendants assert that courts have repeatedly upheld such searches

of MSOP clients, and Plaintiff has failed to plead sufficient facts demonstrating the

searches of his room and person were unreasonable.

"A search occurs under the Fourth Amendment when . . . 'the government violates

a subjective expectation of privacy that society recognizes as reasonable.'"  *Arnzen v.

Palmer*, 713 F.3d 369, 372 (8th Cir. 2013) (quoting *Kyllo v. United States*, 533 U.S. 27,

31-33 (2001)).  "[I]nvoluntarily committed civilly committed persons retain the Fourth

Amendment right to be free from unreasonable searches that is analogous to the right

retained by pretrial detainees."  *Beaulieu*, 690 F.3d at 1028 (citing *Serna v. Goodno*, 567

---

[7] The Complaint identifies a second room search that took place on November 18, 2016 as "a result of [Plaintiff's room]mate . . . refusing to cooperate with the guards because they found something in his pillow case (two pillows instead of the allowed one pillow)."  (Compl. ¶ 22.)  In his response to Defendants' motion, however, Plaintiff states that he "has no objection to the Defendants['] search of his cell because of his cell mate."  (Pl.'s Resp. at 10.) Plaintiff states that "[t]he Defendants attempt to combine this cell search (warranted or not) as the catalyst to excuse the placement into the HSA and eventual Omega 2 or [sic] seizure.  The problem with this assertion is that the Plaintiff was never at any time behaviorally out of control, threatening, or abusive to warrant the seizure or placement."  (Pl.'s Resp. at 10.)  To the extent Plaintiff contends that his placement in the HSA was unlawful, such claims will be considered under the framework of due process.  *See infra* Section III.C.2.c.

F.3d 944, 948-49 (8th Cir. 2009)). And, "'[a]lthough an involuntarily committed patient of a state hospital is not a prisoner per se, his confinement is subject to the same safety and security concerns as that of a prisoner.'" *Id.* (quoting *Revels*, 382 F.3d at 874). To determine "reasonableness" in an institutional setting, a court must balance "the need for the particular search against the invasion of personal rights that the search entails." *Bell v. Wolfish*, 441 U.S. 520, 559 (1979); *accord Serna*, 567 F.3d at 949, 952-56. "Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Bell*, 441 U.S. at 559; *accord Serna*, 567 F.3d at 952-53.

### Room Search

Plaintiff alleges that on July 15, 2016, Kosloski, Sadjak and Gordon conducted an "unwarranted and unsanctioned room search." (Compl. ¶ 19.) Plaintiff alleges that these defendants "shuffled eight different security staff to prolong the search . . . over a six hour period." (Compl. ¶ 19.) During the search, shampoo and toothpaste were emptied into plastic bags, dirty clothes were mixed with clean clothes, and legal papers were mixed with correspondence. (Compl. ¶ 19.) Afterwards, Kosloski told Plaintiff "he could return to his [room] (laughing)." (Compl. ¶ 19.) "Gordon told Plaintiff he knew what he could do to make it stop, and said 'happy birthday.'" (Compl. ¶ 19.)

In *Arnzen*, the Eighth Circuit stated, "[N]either our court nor the Supreme Court has ever outlined exactly what expectation of privacy [involuntarily civilly committed persons and pretrial detainees] reasonably have, outside of our holding that detainees do not have a reasonable expectation of privacy in their jail cells." 713 F.3d at 372. Applying *Arnzen*,

34

*Beaulieu*, and *Serna*, a magistrate judge in this District recently conducted a Fourth Amendment analysis concerning whether a civilly committed individual has an objectively reasonable expectation of privacy in his room at MSOP. *United States v. Senty-Haugen*, 17-cr-182 (JNE/LIB), 2017 WL 6543824, at *5-8, 12-13 (D. Minn. Nov. 21, 2017), *adopting report and recommendation*, 2017 WL 6550674 (D. Minn. Dec. 21, 2017). The magistrate judge observed that the Eighth Circuit "has clearly and repeatedly stated that the Fourth Amendment rights of those involuntarily civilly committed are diminished in scope," and "[]emphasized the long held precedent that a civil committee's expectation of privacy is the same as that of a pretrial detainee." *Id.* at *6, 12. In light of Eighth Circuit percent, the magistrate judge "f[ound] no reason[] why the standard applicable to a pretrial detainee's expectation of privacy would differ from that of a MSOP civil committee." *Id.* at *12. The magistrate judge also noted that, in *Bell*, the Supreme Court "upheld the constitutionality of unannounced, warrantless room searches in a facility housing pretrial detainees reasoning that '[i]t is difficult to see how the detainee's interest in privacy is infringed by the room-search rule. No one can rationally doubt that room searches represent an appropriate security measure . . . ." *Id.* (quoting 441 U.S. at 56-57) (alteration in original). Based on these authorities, the magistrate judge held that an involuntarily civilly committed individual at MSOP "ha[d] no objectively reasonable expectation of privacy in his room" and could not "claim any Fourth Amendment violation deriving from any search of that room." *Id.* at *13.

This Court agrees with the reasoning of the magistrate judge in *Senty-Haugen*. If Plaintiff, as an involuntarily civilly committed individual, retains the same rights as a

pretrial detainee and pretrial detainees do not have a reasonable expectation of privacy in their jail cells, then Plaintiff does not have a reasonable expectation of privacy in his room. *See Arnzen*, 713 F.3d at 372-73; *Senty-Haugen*, 2017 WL 6543824, at *12-13.  "The Supreme Court has interpreted the Fourth Amendment as proscribing unreasonable searches that intrude upon a person's reasonable expectation of privacy." *Azam v. City of Columbia Heights*, 865 F.3d 980, 989 (8th Cir. 2017).  Without a reasonable expectation of privacy, there is no Fourth Amendment claim.  *See Azam*, 865 F.3d at 988-90; *Senty-Haugen*, 2017 WL 6543824, at *13; *Nelson v. Jesson*, No. 13-cv-340 (RHK/JJK), 2013 WL 5888235, at *5 (D. Minn. Nov. 1, 2013); *see also Gross v. Normand*, 576 F. App'x 318, 320 (5th Cir. 2014) (pretrial detainee unable to state a § 1983 claim based on the Fourth Amendment as "an inmate does not have an expectation of privacy in his cell"). Therefore, Plaintiff has failed to state a claim for violation of his Fourth Amendment rights based on the search of his room, and the Court recommends that any Fourth Amendment claim based on the search of his room be dismissed in its entirety as to all Defendants.

That being said, the Court earlier found that Plaintiff has stated a claim for First Amendment retaliation against Kosloski.  Based on the allegations in the Complaint, it is reasonable to infer that Kosloski singled Plaintiff out because he filed the ID Lawsuit, which named her as a defendant, and her conduct was motivated at least in part because of Plaintiff's exercise of his First Amendment rights.  Plaintiff is not complaining about MSOP's policy of searching client rooms in general or a routine search of his room, searches which may well be permissible based on MSOP's interest in maintaining institutional security.  *See, e.g.*, *Beaulieu*, 690 F.3d at 1028; *Senty-Haugen*, 462 F.3d 887-

88; *Karsjens*, 336 F. Supp. 3d at 994-96. Rather, Plaintiff alleges that this particular search was another adverse action that Kosloski took against him that was motivated at least in part because of his exercise of his First Amendment rights.

"[C]ell searches conducted as 'calculated harassment unrelated to prison needs' may violate the Constitution." *Petlock v. Nadrowski*, No. 16-cv-310 (FLW), 2016 WL 7173781, at *8 (D. N.J. Dec. 8, 2016) (quoting *Hudson v. Palmer*, 468 U.S. 517, 530 (1984)). It may very well be that the search conducted by Kosloski was permissible based on MSOP's interest in maintaining institutional security and was not motivated at least in part because Plaintiff filed the ID Lawsuit naming Kosloski as a defendant. But, at this stage of the proceedings, Plaintiff has stated an actionable retaliation claim against Kosloski and this search is but another example of adverse action taken by Kosloski against Plaintiff. Therefore, construing Plaintiff's Complaint as including this search among the adverse actions taken by Kosloski in response to the filing of the ID Lawsuit, the Court further recommends that the search of Plaintiff's room by Kosloski survive as part of Plaintiff's First Amendment retaliation claim against Kosloski, not a Fourth Amendment claim.[8] *See supra* Section III.C.2.a.i.

### *Unclothed Visual Body Searches*

Plaintiff was subject to two unclothed visual body searches, one on December 6 and one on December 7, 2016. (Compl. ¶¶ 34, 42.) Each preceded his placement in the HSA. (Compl. ¶¶ 34, 42.) One search was conducted by Wyatt and Beavens; the other was

---

[8] The Court's earlier analysis applies as to Sadjak and Gordon, who were also involved in the room search. *See supra* Section III.C.2.a.i.

conducted by Shorter and Fischer. (Compl. ¶¶ 34, 42.) For each search, Plaintiff alleges that Wyatt, Beavens, Shorter, and Fischer refused to remove his handcuffs until he complied with the search; he was not exhibiting dangerous and uncontrolled behavior at the time he was searched and placed into the HSA; and various reports confirm that he was not exhibiting such behavior. (Compl. ¶¶ 34, 42, 68, 74; *see* Compl. ¶ 46.)

"In *Beaulieu*, the Eighth Circuit upheld the MSOP's unclothed visual body search policy under the facts of that case." *Karsjens*, 336 F. Supp. 3d at 995 (citing 690 F.3d at 1030); *see also Serna*, 567 F.3d at 952-55. "Evaluating the constitutionality of such searches, however, is a fact-dependent inquiry." *Karsjens*, 336 F. Supp. 3d at 995; *see, e.g.*, *Bell*, 441 U.S. at 559; *Beaulieu*, 690 F.3d at 1027-30; *Serna*, 567 F.3d at 949-56; *Yazzie v. Moser*, No. 12-cv-399 (PAM/JJK), 2014 WL 3687102, at *8-9 (D. Minn. June 11, 2014), *objections sustained in part and overruled in part*, 2014 WL 3687110 (D. Minn. July 24, 2014) [hereinafter *Yazzie II*]; *Allan v. Ludeman*, No. 10-cv-176 (ADM/JJK), 2011 WL 978768, at *4 (D. Minn. Jan. 18, 2011), *adopting report and recommendation*, 2011 WL 978658 (D. Minn. Mar. 17, 2011).

Defendants argue that "[t]he Complaint alleges that Defendants' stated reasons for conducting the [unclothed visual body search] was Plaintiff's 'dangerous and uncontrolled behavior,'" and therefore "the alleged [unclothed visual body search] was done for a legitimate security purpose and was not unlawful." (Defs.' Mem. in Supp. at 16.) But, a fair reading of Plaintiff's Complaint is that Defendants' proffered justification for the search—dangerous and uncontrolled behavior warranting placement in the HSA—was not true. As discussed below, Plaintiff has pleaded that he was not exhibiting dangerous and

uncontrolled behavior at the time he was strip-searched and placed into the HSA, and that various reports in connection with his confinement in the HSA demonstrate that he was not exhibiting such behavior.  *See infra* Section III.C.2.c.  Assuming the truth of Plaintiff's allegations, as this Court must, the two unclothed visual body searches would appear to be unreasonable under the circumstances.

Any claim on the use of unclothed visual body searches "turns in part on the extent to which th[e] Court has sufficient expertise and information in the record to mandate, under the Constitution, the specific restrictions and limitations sought by those who challenge the visual search procedures at issue."  *Florence v. Bd. of Chosen Freeholders of the Cty. of Burlington*, 566 U.S. 318, 322 (2012); *accord Beaulieu*, 690 F.3d at 1028. The Court recognizes that, "[i]n addressing this type of constitutional claim[,] courts must defer to the judgment of correctional officials unless the record contains substantial evidence showing their policies are an unnecessary or unjustified response to problems of [institutional] security."  *Florence*, 566 U.S. at 322-23; *accord Beaulieu*, 690 F.3d at 1028. The Supreme "Court has confirmed the importance of deference to correctional officials and explained that a regulation impinging on an inmate's constitutional rights must be upheld 'if it is reasonably related to legitimate penological interests.'"  *Florence*, 566 U.S. at 326 (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)); *accord Beaulieu*, 690 F.3d at 1029.

At this stage, on a motion to dismiss, the Court does not have the benefit of Defendants' explanation as to why the two unclothed visual body searches of Plaintiff were reasonable.  "[S]trip searches conducted at MSOP facilities may or may not be reasonable,

and thus may or may not be constitutional, depending on the circumstances." *Allan*, 2011 WL 978768, at \*4. Plaintiff has alleged that these two unclothed visual body searches were unnecessary and unjustified, and therefore unreasonable, because there was no risk to institutional security, i.e., he was not exhibiting dangerous and uncontrollable behavior. "The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails." *Bell*, 441 U.S. at 559. In looking at the reasonableness of such searches, courts must consider the manner in which it is conducted. *Id.* The Court cannot conclude, as Defendants suggest, that Plaintiff has failed to state a claim at this juncture.

### *Qualified Immunity*

Under the Fourth Amendment, Plaintiff has a clearly established right to be free from unclothed visual body searches conducted in an abusive manner. *Ivey v. MSOP*, No. 12-cv-30 (DWF/TNL) (Order at 5 n.3, ECF No. 70) (D. Minn. Mar. 31, 2017) [hereinafter *Ivey Order*]; *see Serna*, 567 F.3d at 949; *see also Beaulieu*, 690 F.3d at 1028. At this point in the litigation, assuming the truth of Plaintiff's allegations that he was twice subjected to unclothed visual body searches that were not being performed in response to a threat to institutional security, the Court cannot conclude whether a reasonable person would have known such searches violated any rights in the context of a motion to dismiss. Until the claims in this case are further developed, the Court cannot determine whether qualified immunity applies.

Therefore, the Court recommends that Defendants' motion be denied with respect to Plaintiff's unreasonable search claims under the Fourth Amendment against Wyatt, Beavens, Shorter, and Fischer for the unclothed visual body searches that occurred on December 6 and 7, 2016. (Compl. ¶¶ 34, 42.)

## ii.    Seizures

As best as this Court is able to tell, Plaintiff appears to be alleging that three unreasonable seizures occurred based on his placement in the HSA on December 6 and December 7, 2016, and the subsequent transfer to the Omega Two unit—actions that Plaintiff alleges were intended to punish him. (Compl. ¶¶ 66-83.) The Court concludes that the curtailment of any liberty interest resulting from such placement is more properly viewed in the context of his due process claims. *See infra* Section III.C.2.c. Similarly, in his response to Defendants' motion to dismiss, Plaintiff characterizes the behavioral reports in which he was written up for things that other MSOP clients are allowed to do as "seizures." (Pl.'s Resp. at 10 ("The Defendants admit that they seized Plaintiff's access to the yard, religion, gym and other activities that all other detainees are allowed.").) The Court has construed these alleged curtailments in conjunction with Plaintiff's First Amendment claims. *See Stone*, 364 F.3d at 915. *See supra* Section III.C.2.a.i, .ii.

## c.    Fourteenth Amendment

As best as this Court is able to tell, Plaintiff appears to be asserting both procedural and substantive due process claims based on his confinement in the HSA on December 6 and 7, 2016, and his subsequent transfer to the Omega Two unit.

41

"The Due Process Clause of the Fourteenth Amendment ensures that states do not deprive individuals of life, liberty, or property without due process of law." *Mills v. City of Grand Forks*, 614 F.3d 495, 498 (8th Cir. 2010) (citing U.S. Const. amend XIV, § 1); *accord Singleton v. Cecil*, 176 F.3d 419, 424 (8th Cir. 1999).

> This clause has two components: the procedural due process and the substantive due process components. Analysis of either a procedural or substantive due process claim must begin with an examination of the interest allegedly violated, and the possession of a protected life, liberty, or property interest is a condition precedent to any due process claim. Where no such interest exists, there can be no due process violation.

*Singleton*, 176 F.3d at 424 (quotations and citations omitted); *accord McDonald*, 679 F.3d at 704.

Based on his civil commitment, Plaintiff's "liberty interests are considerably less than those held by members of free society." *Senty-Haugen*, 462 F.3d at 886. "The nature of [Plaintiff's] liberty interest in being free from isolation must therefore be understood in the context of that commitment and its accompanying restrictions." *Id.*; *accord Beaulieu*, 690 F.3d at 1028. Defendants do not appear to dispute that placement in the HSA and Omega Two may implicate a liberty interest, arguing instead that Plaintiff's placements were too short to constitute any violation. (Defs.' Mem. in Supp. at 19-20; *see* Defs.' Reply at 10.) As stated above, civilly committed individuals like Plaintiff retain liberty interests analogous to pretrial detainees. *Youngberg v. Romeo*, 457 U.S. 307, 319-20 (1982); *Hall v. Ramsey Cty.*, 801 F.3d 912, 919 (8th Cir. 2015); *Serna*, 567 F.3d at 948-49; *accord*

42

*Beaulieu*, 690 F.3d at 1028; *see also, e.g.*, *Benson II*, 2017 U.S. Dist. LEXIS 158017, at *8; *Yazzie II*, 2014 WL 3687110, at *2.

### HSA Placements

Plaintiff alleges that he was placed in the HSA twice[9] without justification, namely, that he was not "exhibiting any dangerous or uncontrolled behavior to justify the placement." (Compl. ¶ 34; *accord* Compl. ¶ 42.) Each time, Plaintiff alleges that his placement in the HSA was for the convenience of MSOP staff "which is explicitly prohibited by policy (MSOP 415-5085)." (Compl. ¶ 34; *accord* Compl. ¶ 42.) "At no time was Plaintiff afforded either the opportunity to challenge the basis for his detention or access to any evidence that justified the detention." (Compl. ¶ 34; *accord* Compl. ¶¶ 35, 36, 37, 42, 43, 44.)

### December 6 through December 7

On December 6, 2016, Wyatt and Beavens "handcuffed, strip-searched and placed" Plaintiff in the HSA. (Compl. ¶ 34.) "Revealed in the report, is that, Plaintiff wasn't exhibiting any dangerous or uncontrolled behavior to justify the placement." (Compl.

___
[9] On or about December 13, 2016, it appears that Plaintiff was again placed in the HSA, but the circumstances of this particular placement are not described. (*See* Compl. ¶ 47.) On December 14, Goeglein, Korby and Schesso reviewed "Plaintiff's placement in the HSA after 24 hours." (Compl. ¶ 47.) These defendants "implicitly cite and admit that Plaintiff wasn't exhibiting any dangerous, assaultive, or threatening behavior and that the HSA was used for staff convenience." (Compl. ¶ 47.) According to Plaintiff, "[t]he[se d]efendants['] stance is that by Plaintiff refusing to [ac]cept punishment he is disruptive to the therapeutic environment and facility as a whole. But the[se d]efendants go further, by refusing to relinquish his right to be free of punishment is considered a [sic] 'uncontrollable behavior.'" (Compl. ¶ 47.)

It is not entirely clear what constitutional claims, if any, Plaintiff is attempting to assert based on this placement. Unlike the HSA placements that began December 6 and 7, Plaintiff has not included a particular count in the Complaint with respect to this placement as he did for the other two placements. (*See* Counts IV, V, Compl. ¶¶ 66-77; *see also* Compl. ¶¶ 10 ("(h) The MSOP used the High Security Area (HSA), *two* times, for its convenience to intimidate, humiliate, and isolate . . . Plaintiff." (Emphasis added.)), 92 ("Plaintiff was denied due process by Defendants due to his confinement in the HSA for *two* days, and placed in the high restrictive Omega Two Unit (hybrid HSA) without being presented with any evidence to support his detainment." (Emphasis added.)).)

¶ 34.) "The guards have unmistak[en]ably implied that Plaintiff is refusing to accept or allow them to punish him, and this is out of control behavior." (Compl. ¶ 34.)

Gianinni, Fischer, and Johnson reviewed Plaintiff's placement after four hours. (Compl. ¶ 35.) They "falsely accused . . . Plaintiff of exhibiting dangerous and uncontrollable behavior because [he] would not accept any form of punishment." (Compl. ¶ 35.) They did "not attempt to explain any other perceived uncontrollable dangerous behavior." (Compl. ¶ 35.)

On December 7, Brindamor, Aldrin, and Lind reviewed Plaintiff's HSA placement after 24 hours. (Compl. ¶ 36.) These defendants "again falsely accused . . . Plaintiff of exhibiting dangerous and uncontrollable behavior because . . . [he] would not accept any form of punishment," and did not "attempt to explain any other perceived uncontrollable dangerous behavior." (Compl. ¶ 36.)

Another review of Plaintiff's placement in the HSA was conducted on December 7 by Goeglein, Korby, and Schesso. (Compl. ¶ 37.) These defendants were "in lock step on the narrative that . . . Plaintiff was exhibiting dangerous and uncontrollable behavior because . . . [he] would not accept any form of punishment," and "explain[ed] that by not accepting illegal sanctions and punishment . . . Plaintiff was a threat to the security and operation of the facility, thus there was no other option but the HSA." (Compl. ¶ 37.)

Plaintiff was released from the HSA on December 7. (Compl. ¶ 38.) In a report entitled "Discontinuation of Protective Isolation Status," Lind wrote that Plaintiff was being released because he was not "threatening the safety or security of the facility." (Compl. ¶ 38.) Lind also noted that "Plaintiff was exhibiting behavior that was under

44

control since placement in the HSA," thus contradicting earlier reports that Plaintiff was exhibiting dangerous and uncontrollable behavior. (Compl. ¶ 38.)

*December 7 through December 8*

On December 7, 2016, Shorter and Fischer handcuffed and strip-searched Plaintiff before placing him into the HSA. (Compl. ¶ 42.) Shorter and Fischer wrote a "Protective Isolation Status Placement and Immediate Review" report in which they "falsely reported that Plaintiff was exhibiting and uncontrolled behavior." (Compl. ¶ 42.) "The[se] Defendants admit to using the HSA because Plaintiff is refusing to accept or allow them to punish him, claiming this is out of control behavior." (Compl. ¶ 42.)

Gianinni, Fischer, and Cowell reviewed Plaintiff's placement after four hours. (Compl. ¶ 43.) They "falsely accused Plaintiff of exhibiting dangerous and uncontrollable behavior because . . . Plaintiff would not accept any form of punishment." (Compl. ¶ 43.) They did not "attempt to explain any other perceived uncontrollable dangerous behavior." (Compl. ¶ 43.)

On December 8, Cellelo and Beavens conducted a review of Plaintiff's placement in the HSA. (Compl. ¶¶ 44, 45.) They "falsely accused . . . Plaintiff of exhibiting dangerous and uncontrollable behavior because . . . Plaintiff would not accept any form of punishment." (Compl. ¶ 44.) They did not "attempt to explain or describe any perceived uncontrollable or dangerous behavior." (Compl. ¶ 44.)

Plaintiff was released from the HSA on December 8. (Compl. ¶ 46.) Beavens wrote a report entitled "Discontinuation of Protective Isolation Status," in which she stated that Plaintiff was being released because he was not "threatening the safety or security of the

facility." (Compl. ¶ 46.) Beavens also stated in the report that "Plaintiff was exhibiting behavior that was under control since placement in the HSA," thus "prov[ing] at no time did . . . Plaintiff exhibit any kind of threatening, violent, assaultive behavior that would threaten the safety or security of the facility, clearly proving [the] HSA was used for staff convenience." (Compl. ¶ 46.) "The report contradictorily state[d] that Plaintiff would be moved to the Omega Two (HSA under another name) under an assigned room move because he was exhibiting uncontrollable behavior." (Compl. ¶ 46.)

### *Omega Two Placement*

On December 8, 2016, Cellelo and Beavens informed Plaintiff that he would be placed in Omega Two. (Compl. ¶ 45.) Omega Two "is a hybrid HSA unit" with "overly punitive conditions." (Compl. ¶ 10.) As "another form of HSA, [Omega Two] allows for continued and damaging sterile isolation." (Compl. ¶ 46.) While Cellelo and Beavens informed Plaintiff of his placement in Omega Two, the decision to assign Plaintiff to Omega Two was made "by the unidentified team." (Compl. ¶ 45.) At the same time he was informed that he was being placed in Omega Two, Plaintiff was also informed that he had legal mail. (Compl. ¶ 45.) According to Plaintiff, this legal mail was the undersigned's report and recommendation on motions to dismiss filed in the ID Lawsuit, recommending that some of Plaintiff's clams survive. (Compl. ¶ 45.) "Plaintiff was pressed by the guards to understand that his placement in Omega Two was a direct result of the Court[']s refusing to dismiss the complaint [in the ID Lawsuit] (it was the Court[']s fault." (Compl. ¶ 45.) In a report, Beavens stated that Plaintiff was being moved to Omega 2 "because he was exhibiting uncontrollable behavior." (Compl. ¶ 46.) In the same report, which was written

when Plaintiff was released from the HSA, Beavens stated that Plaintiff was being released because he was not threatening the safety or security of the facility. (Compl. ¶ 46.) "There [wa]s no discussion of any uncontrollable or dangerous behavior that would justify the placement," and "[a]t no time was Plaintiff afforded to having either the opportunity to challenge the basis for his detention or access to any evidence that justified the detention." (Compl. ¶ 45.)

### *"Special Punishments"*

Plaintiff alleges that he received other "special punishments" after so-called unfair hearings where the panel rejected evidence that he was being targeted and retaliated against. (Compl. ¶ 14; *see* Compl. ¶ 86.)

### i.    Procedural Due Process

"Due process is a flexible concept, requiring only 'such procedural protections as the particular situation demands.'" *Clark v. Kansas City Missouri Sch. Dist.*, 375 F.3d 698, 702 (8th Cir. 2004) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976)); *accord Mickelson v. Cty. of Ramsey*, 823 F.3d 918, 924 (8th Cir. 2016) (noting "requirements of due process are not rigid").

"In evaluating the constitutionality of conditions or restrictions of pretrial detention that implicate only the protection against deprivation of liberty without due process of law, . . . the proper inquiry is whether those conditions amount to punishment of the detainee." *Bell*, 441 U.S. at 535. The same standard applies to involuntarily committed individuals. *Hall*, 801 F.3d at 919; *see, e.g., Benson II*, 2017 U.S. Dist. LEXIS 158017, at *8-9; *Yazzie II*, 2014 WL 3687110, at *3.

47

> [I]f a particular condition or restriction of pretrial detention is
> reasonably related to a legitimate governmental objective, it does
> not, without more, amount to "punishment."   Conversely, if a
> restriction or condition is not reasonably related to a legitimate
> goal-if it is arbitrary or purposeless-a court permissibly may infer
> that the purpose of the governmental action is punishment . . . .

*Bell*, 441 U.S. at 539 (footnote omitted); *accord Hall*, 801 F.3d at 919.  These legitimate

government objectives include maintaining order and security.  *Bell*, 441 U.S. at 540; *see*

*Hall*, 801 F.3d at 919.  "Although an involuntarily committed patient of a state hospital is

not a prisoner per se, his confinement is subject to the same safety and security concerns

as that of a prisoner."  *Beaulieu*, 690 F.3d at 1028 (quotation omitted); *see Senty-Haugen*,

462 F.3d at 887 ("The safety of the [MSOP] facility is one of the key responsibilities of

Offender Program officials . . . ."), 888 (MSOP officials "have a 'vital interest' in

maintaining a secure environment").

    In the ID Lawsuit, the district court concluded that Plaintiff had stated a procedural

due process claim based on his allegations that he was placed in the HSA without adequate

process.  *Benson II*, 2017 U.S. Dist. LEXIS 158017, at *9.  The district court summarized

Plaintiff's allegations as follows:

> Plaintiff alleges that he was told he would be receiving a
> Behavioral Expectation Report and that he would face
> "consequences" for failing to wear his identification badge.
> (Am. Compl. ¶ 16.)  Plaintiff asserts that he was "handcuffed,
> strip-searched, denied his property, and confined alone in a
> cell" for one day without being presented any evidence or
> support for the confinement.  (*Id.* at 21.)  Plaintiff points to
> MSOP Policy 301.085 which details specific circumstances
> under which committed individuals are to be considered on
> "Protective Isolation Status."  (*Id.* ¶ 18.)  According to the
> policy quoted in the Complaint: "A client is considered to be
> on Protective Isolation status when the client is placed in a

48

> room, from which the person is not able or permitted to exit, as a way of defusing or containing dangerous behavior that is uncontrollable by any other means." (*Id.*) Plaintiff alleges that his conduct did not warrant such isolation and that Defendants failed to explain the safety or security risk posed by his behavior. (*Id.*) Based on the circumstances, Plaintiff alleges that "[i]t is clear the Defendants used the HSA for convenience and punishment." (*Id.* ¶ 19.)

*Id.* at *9-10. Based on these allegations, the district court concluded that Plaintiff had "adequately allege[d] that his failure to wear the identification badge did not justify placement in the HSA due to safety or security concerns and that his detention amounted to punishment justifying procedural due process protections." *Id.* at *10 (footnote omitted). Acknowledging that "[t]his is a close call," the district court held that it could "[]not conclude what process would be constitutionally required under these circumstances at the pleading stage," and denied the motions to dismiss with respect to Plaintiff's procedural due process claim. *Id.* at *10-11.

Here, Plaintiff is asserting that he was placed in the HSA on December 6 and December 7 "as a form of punishment in violation of his constitutionally protected liberty interest." *Hall*, 801 F.3d at 919. Plaintiff has again alleged that he was not exhibiting any dangerous or uncontrolled behavior on either occasion. (Compl. ¶¶ 10(m), 34, 42.) Yet, each time, he was "handcuffed, strip-searched and placed in the [HSA]." (Compl. ¶¶ 34, 42.) Plaintiff alleges that MSOP Policy 415-5085 explicitly prohibits MSOP staff from using the HSA for their convenience. (Compl. ¶ 34; *see* Compl. ¶¶ 10(h), 42.) Plaintiff alleges that "[t]he Defendants are using the HSA for their convenience which is explicitly prohibited by policy." (Compl. ¶ 42.)

49

Plaintiff further alleges that various reports generated in connection with his placement in the HSA demonstrate that his conduct did not warrant such placement. (*See, e.g.*, Compl. ¶¶ 38, 46.) Plaintiff alleges that the only "perceived uncontrollable dangerous behavior" described is that he was "refusing to accept or allow [the Defendants] to punish him, claiming this is out of control behavior." (Compl. ¶¶ 34, 35; *accord* Compl. ¶¶ 36, 37, 42, 43, 44.)

Additionally, despite the periodic reviews of his confinement, Plaintiff alleges that "[a]t no time was [he] afforded either the opportunity to challenge the basis for his detention or access to any evidence that justified the detention." (Compl. ¶ 35; *accord* Compl. ¶¶ 10(l), 36, 37, 42, 43, 44.) "The fundamental requirement of due process 'is the opportunity to be heard at a meaningful time and in a meaningful manner.'" *Clark*, 375 F.3d at 702 (quoting *Mathews*, 424 U.S. at 333) (internal quotation marks omitted); *see Senty-Haugen*, 462 F.3d at 888. While this Court likewise cannot conclude what process would be constitutionally required under these circumstances at this stage, Plaintiff has alleged facts showing that he lacked an opportunity to be heard regarding his placement in the HSA. *See Benson II*, 2017 U.S. Dist. LEXIS 158017, at *10-11; *cf. Creason v. City of Washington*, 435 F.3d 820, 824 (8th Cir. 2006); *Perseke v. Moser*, No. 16-cv-557 (PJS/LIB), 2016 WL 6275191, at *5 (D. Minn. Sept. 26, 2016), *adopting report and recommendation*, 2016 WL 6246761 (D. Minn. Oct. 25, 2016).

In sum, Plaintiff has alleged facts showing that his conduct on December 6 and December 7 did not justify placement in the HSA due to safety or security concerns, such detention amounted to punishment under the circumstances, and he was denied an

opportunity to be heard. Therefore, the Court concludes that Plaintiff has stated a procedural due process claim against Wyatt, Beavens, Gianinni, Fischer, Johnson, Brindamor, Aldrin, Lind, Goeglein, Korby, Schesso, Shorter, Cowell, and Cellelo based on his placement in the HSA on December 6 and December 7, 2016.

***Qualified Immunity.*** "[I]t is settled that pretrial detainees possess a constitutional right 'to be free from punishment.'" *Williamson v. Stirling*, 912 F.3d 154, 173 (4th Cir. 2018) (citing *Bell*, 441 U.S. at 535); *see, e.g.*, *Phillips v. Kiser*, 172 F. App'x 128, 129 (8th Cir. 2006) (per curiam); *Whitfield v. Dicker*, 41 F. App'x 6, 7 (8th Cir. 2002) (per curiam); *Smith v. Copeland*, 87 F.3d 265, 268 (8th Cir. 1996); *Martinez v. Turner*, 977 F.2d 421, 423 (8th Cir. 1992). At this point in the litigation, assuming the truth of Plaintiff's allegations, Plaintiff has adequately alleged that his placement in the HSA on December 6 and December 7 was not reasonably related to a legitimate government objective and that such placement amounted to punishment justifying procedural due process protections. *See Hall*, 801 F.3d at 919-20; *Benson II*, 2017 U.S. Dist. LEXIS 158017, at *10.

Ultimately, it may be that Plaintiff's placement in the HSA on each occasion was reasonably related to a legitimate government objective, and therefore was not punishment in the constitutional sense. *See Hall*, 801 F.3d at 919-20. Or, it may be that Plaintiff received all of the process that he was due after "balancing the specific interest that was affected, the likelihood that . . . [MSOP's] procedures would result in an erroneous deprivation, and . . . [MSOP's] interest in providing the process that it did, including the administrative costs and burdens of providing additional process." *Senty-Haugen*, 462

51

F.3d at 886 (citing *Mathews*, 424 U.S. at 332-35); *see Franco v. Moreland*, 805 F.2d 798, 801 (8th Cir. 1986); *see also Williamson*, 912 F.3d at 173-77.

At this stage, however, Plaintiff has adequately alleged that he was not afforded an opportunity to be heard—one of the fundamental requisites of due process—and that his placement in the HSA on December 6 and December 7 was not reasonably related to a legitimate government objective. Assuming the truth of these allegations, the Court cannot conclude whether a reasonable person would have known that Plaintiff's placement in the HSA on December 6 and December 7 constituted punishment in the constitutional sense or that the process (or lack thereof) provided in connection with those placements was constitutionally adequate. *See Hall*, 801 F.3d at 919-20; *Senty-Haugen*, 462 F.3d at 885-88. Until the claims in this case are further developed, the Court cannot determine whether qualified immunity applies.

Therefore, the Court recommends that Defendants' motion be denied with respect to Plaintiff's procedural due process claims against Wyatt, Beavens, Gianinni, Fischer, Johnson, Brindamor, Aldrin, Lind, Goeglein, Korby, Schesso, Shorter, Cowell, and Cellelo based on his placement in the HSA on December 6 and December 7, 2016. (Compl. ¶¶ 34-38, 42-44, 46.)

ii.    **Substantive Due Process**

The right to substantive due process under the Fourteenth Amendment "protects individual liberty against certain government actions regardless of the fairness of the procedures used to implement them." *Norris v. Engles*, 494 F.3d 634, 637 (8th Cir. 2007) (quotation omitted). "In the context of substantive due process, an individual must

52

overcome a very heavy burden to show a violation of the Fourteenth Amendment." *Hall*,

801 F.3d at 917.

> To establish a violation of an individual's substantive due
> process rights, the plaintiff must demonstrate *both* that the
> official's conduct was conscience-shocking, *and* that the
> official violated one or more fundamental rights that are deeply
> rooted in this Nation's history and tradition, and implicit in the
> concept of ordered liberty, such that neither liberty nor justice
> would exist if they were sacrificed.

*Norris*, 494 F.3d at 637-38 (quotation omitted); *accord Karsjens*, 845 F.3d at 408; *Hall*,

801 F.3d at 917.

> To meet this high standard, . . . the alleged substantive due
> process violations must involve conduct so severe[,] so
> disproportionate to the need presented, and so inspired by
> malice or sadism rather than a merely careless or unwise excess
> of zeal that it amounted to a brutal and inhumane abuse of
> official power literally shocking to the conscience.

*Karsjens*, 845 F.3d at 408 (quotation omitted). "The theory of substantive due process is

properly reserved for truly egregious and extraordinary cases." *Mills*, 614 F.3d at 498

(quotation omitted); *see also Montin v. Gibson*, 718 F.3d 752, 755 (8th Cir. 2013) ("[A]

plaintiff may maintain a substantive due process claim only if the contested state action is

so egregious or outrageous that it is conscience-shocking." (quotations and citations

omitted)); *Hall*, 801 F.3d at 917 ("[A] government official's conduct must be 'so egregious,

so outrageous, that it may fairly be said to shock the contemporary conscience.'" (quoting

*Cty. of Sacramento v. Lewis*, 523 U.S. 833, 847-48 n.8 (1998)).

*Professional-Judgment Test.* "The Supreme Court has recognized that

involuntarily civilly committed persons hold a protected liberty interest in being free from

unnecessary bodily restraint." *Montin*, 718 F.3d at 755-54 (citing *Youngberg*, 457 U.S. at 320-22). *Youngberg* involved physical restraints placed on an individual who was involuntarily committed to a state mental institution. 457 U.S. at 309-10. At first, the individual had been "physically restrained during portions of each day" while he was recovering from treatment of a broken arm. *Id.* at 310. Later, after his arm healed, he was restrained "for prolonged periods on a routine basis." *Id.* at 311.

Under *Youngberg*, "[t]he test for assessing the constitutionality of such a restraint is a 'professional judgment' test." *Montin*, 718 F.3d at 755 (citing 457 U.S. at 321). "'[T]he Constitution only requires that the courts make certain that professional judgment in fact was exercised. It is not appropriate for the courts to specify which of several professionally acceptable choices should have been made.'" *Beaulieu*, 690 F.3d at 1032 (quoting *Youngberg*, 457 U.S. at 321). "Pursuant to this test, great deference is owed to the professional judgment of a qualified professional charged with balancing the plaintiff's freedom from bodily restraint against the safety of the public, the plaintiff, and other patients." *Montin*, 718 F.3d at 755 (citing *Youngberg*, 718 F.3d at 321).

> [T]he decision, if made by a professional, is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment.

*Youngberg*, 457 U.S. at 323 (footnotes omitted); *accord Beaulieu*, 690 F.3d at 1032-33; *Perseke*, 2016 WL 6275191, at *7.

In *Montin*, the Eighth Circuit considered a due process challenge brought by "an involuntarily committed mental patient" to "a facility-wide change in policy depriv[ing] him of a previously held ability to walk unsupervised around an unsecured area of the grounds." 718 F.3d at 753. The Eighth Circuit began its analysis by citing *Youngberg* and "recogni[zing] that involuntarily civilly committed persons hold a protected liberty interest to be free from unnecessary *bodily* restraint." *Id.* at 754-55 (emphasis added). The Eighth Circuit observed that "[n]either our court nor the Supreme Court have held that a refusal to permit an involuntarily civilly committed person to walk unsupervised in an unsecured area rises to the level of a 'bodily restraint.'" *Id.* at 755.

As for the "restraint" challenged in *Montin*, the Eighth Circuit stated that "[t]here is a stark difference between actual physical restraints we have addressed in prior opinions and the interest Montin asserts in this case," citing *Beaulieu*, 690 F.3d at 1031, involving "use of 'a black box, a wrist chain, and leg irons' for 'travel outside of the secure perimeter'"; *Strutton v. Meade*, 668 F.3d 549, 553 (8th Cir. 2012), involving "use of a 'restriction table'"; and *Heidemann v. Rother*, 84 F.3d 1021, 1025 (8th Cir. 1996), where "the body of a non-verbal, physically and mentally disabled nine-year-old girl who suffered from epilepsy" was "tightly b[ound] with a blanket." *Montin*, 718 F.3d at 755; *see also Norris*, 494 F.3d at 637-39. Acknowledging that "[a]t some point along the spectrum of restrictions that might potentially be characterized as bodily restraints, the asserted restraint becomes merely an incident of the fact of commitment," the Eight Circuit held "that Montin simply has failed to articulate a bodily restraint." *Montin*, 718 F.3d at 755.

55

Placement in the HSA is another point along that continuum. To some degree, Plaintiff's placement in the HSA arguably implicates his interest in being free from unnecessary bodily restraint. *See Perseke*, 2016 WL 6275191, at \*5. Such placement appears more restrictive than merely an incident of the fact of his civil commitment as was present in *Montin*. Yet, placement in the HSA does not involve the actual physical restraints present in *Youngberg*, *Beaulieu*, *Strutton*, and *Heidemann*.

In *Montin*, the Eighth Circuit observed that, "[w]hen *Youngberg* does not apply, the 'professional-judgment' standard does not apply. In such a situation, a plaintiff may maintain a substantive due process claim only if the contested state action is so egregious or outrageous that it is conscience-shocking." 718 F.3d at 755 (citation and quotation omitted). In *Karsjens*, the Eighth Circuit emphasized that a plaintiff must show that a state actor's actions were conscience-shocking in order to maintain a substantive due process claim. 845 F.3d at 408, 410; *see Benson II*, 2017 U.S. Dist. LEXIS 158017, at \*11. In the absence of actual physical restraint, the Court considers whether Plaintiff has alleged facts that his placement in the HSA was so egregious or outrageous as to shock the contemporary conscience.

***Conscience-Shocking Test.*** As stated above, substantive-due process violations are rare, involving truly egregious and extraordinary cases. Plaintiff has alleged facts showing that his conduct on December 6 and December 7 did not justify placement in the HSA due to safety or security concerns and such detention amounted to punishment under the circumstances. But, "even if it is determined that the conduct at issue violated a fundamental right, it will constitute a substantive due process violation only if it is also

56

determined to shock the conscience." *Norris*, 494 F.3d at 638; *see Karsjens*, 845 F.3d at 408, 410; *Montin*, 718 F.3d at 755; *Semler*, 2010 WL 145275, at *27. Plaintiff has failed to allege facts showing that his placement in the HSA on December 6 and December 7 was conscience-shocking. Plaintiff has alleged that he was placed in the HSA twice, for approximately 24 hours each time. The Complaint does not describe the conditions in the HSA other than by implication that it is more restrictive than his general confinement at MSOP and a comparison to Omega Two, which "allows for continued and damaging sterile isolation." (Compl. ¶ 45 n.7.) Assuming the truth of Plaintiff's allegations that he was placed in a more restrictive environment on two occasions and that each placement was unwarranted because he was not engaging in dangerous or uncontrollable behavior, the fact these temporary placements may have been unwarranted does not rise to the level of being so severely egregious or outrageous as to demonstrate a brutal and inhumane abuse of power shocking to the conscience. *See Williamson*, 912 F.3d at 181 (pretrial detainee "presented evidence on which a reasonable factfinder could conclude that his three-and-a-half years of solitary confinement were so excessive relative to his infractions—and the defendants so arbitrary in their actions—that [he] suffered unconstitutional punishment in violation of his substantive due process rights"); *see also Wickner*, 2011 WL 6960975, at *3 n.2 ("inadequacy of . . . due process claim c[ould] be readily understood" in comparison with *Smith* where the Eighth Circuit held that a pretrial detainee failed to state a due process claim based on his placement in segregation for four days in which the toilet overflowed and he was made to endure the stench of his own feces and urine as "the raw sewage

allegation amounted to no more than a *de minimis* imposition that did not implicate constitutional concerns" (quotation omitted)).

Accordingly, Plaintiff has failed to state a substantive due process claim for his placement in the HSA on December 6 and December 7, 2016, and the Court recommends his substantive due process claims based on placement in the HSA on December 6 and December 7, 2016, be dismissed in their entirety as to all Defendants.

### iii.    Omega Two & Other Allegations

With respect to Plaintiff's placement in Omega Two, Plaintiff has not pleaded the personal involvement of any Defendant.  Plaintiff alleges that Cellelo and Beavens *informed* him that he would be placed in Omega Two, but that the decision had been made by an "unidentified team."  (Compl. ¶ 45.)  Plaintiff alleges that he "was pressed by [Cellelo and Beavens] to understand that his placement in Omega Two was a direct result" of the ID Lawsuit not being dismissed.  (Compl. ¶ 45.)  But, Plaintiff does not allege that Cellelo, Beavens, or any of Defendants were involved in any way in the decision to place him in Omega Two.  "To state a claim under § 1983, the plaintiff must plead that a government official has personally violated the plaintiff's constitutional rights."  *Jackson*, 747 F.3d at 543 (citing *Iqbal*, 556 U.S. at 676).  The failure to plead facts showing how one or more Defendants were personally involved in the placement is fatal to any claims regarding Omega Two, and the Court recommends that any due process claim based on Plaintiff's placement in Omega Two be dismissed in their entirety as to all Defendants.

Similarly, to the extent Plaintiff is attempting to bring due process claims based on other "special punishments" he may have received, Plaintiff has not identified what the

administered "special punishments" were.   Just because Plaintiff has identified the resulting action/consequence as a "punishment" does not mean that such action/consequence constitutes punishment in the constitutional sense.  *See Bell*, 441 U.S. at 539; *Hall*, 801 F.3d at 919.   While a complaint need not contain detailed factual allegations, it still must contain sufficient facts from which it can be reasonably inferred that the alleged conduct violated Plaintiff's constitutional rights.  *Iqbal*, 556 U.S. at 678; *see also Gerstner*, 386 F. App'x at 575; *Stringer*, 446 F.3d at 802.   "[N]aked assertions devoid of further factual enhancement" are not enough.  *Iqbal*, 553 U.S. at 678 (quotation omitted).  Nor is it sufficient for Plaintiff to allege in a conclusory fashion that such "special punishments" violated his constitutional rights without pleading facts showing that such punishments were so severely egregious or outrageous as to demonstrate a brutal and inhumane abuse of power shocking to the conscience.  *Id.*; *see Karsjens*, 845 F.3d at 408, 410; *Montin*, 718 F.3d at 755; *Semler*, 2010 WL 145275, at *27.  Therefore, to the extent Plaintiff is attempting to bring additional due process claims based on other "special punishments" he received, the Court recommends that such claims be dismissed as to all Defendants for failure to state a claim.

### 3.  Supervisory Claims

As best as the Court is able to tell, Plaintiff appears to be alleging that Johnson Piper, Richardson, Moser, Kniesel, Sadjak, Benoit, and Kosloski have violated his constitutional rights by not performing certain supervisory functions, namely, the investigation of the purported retaliation and not implementing hearing procedures to protect Plaintiff's rights.

Johnson Piper is the Commissioner of DHS, the department that oversees MSOP. (Compl. ¶ 7(a), (b).)  The remaining Defendants are employees of MSOP.  Richardson is the Executive Director.  (Compl. ¶ 7(c).)  Moser is the Facility Director.  (Compl. ¶ 7(d).)  Kniesel and Sadjak are Assistant Facility Directors.  (Compl. ¶ 7(e), (f).)  Sadjak is Gordon's supervisor.  (Compl. ¶ 24.)  Benoit is the Program Manager.  (Compl. ¶ 7(l).)  Kosloski is the Unit 1-B Director.  (Compl. ¶ 7(q).)  Plaintiff alleges that these Defendants "have and continue to violate and abuse [his] constitutional rights by nurturing an aggressive enforcement of vague and arbitrary polices without hearings or redress." (Compl. ¶ 12.)  Plaintiff alleges that these Defendants have refused to investigate his formal requests of "claims of targeting and harassment," including "refus[ing] to investigate or question the numerous clients that have witnessed" the purported harassment and retaliation.  (Compl. ¶ 12; *see* Compl. ¶ 24.)  Plaintiff alleges that he complained to Sadjak "about the 'progressive and deliberate harassment' that he was enduring," and Sadjak responded "that 'he wasn't discounting' the concerns but [that Plaintiff should] report them to . . . Gordon's *subordinates*."  (Compl. ¶ 24.)  In addition, Plaintiff alleges that these Defendants "have refused to allow for hearings or implement procedures to protect . . . [his] rights."  (Compl. ¶ 12.)

"Supervisors cannot be held vicariously liable under § 1983 for the actions of a subordinate."  *Beaulieu*, 690 F.3d at 1030 (quotation omitted); *see Iqbal*, 556 U.S. at 676. "[A] supervising officer can be liable for an inferior officer's constitutional violation only if he directly participated in the constitutional violation, or if his failure to train or supervise

the offending actor caused the deprivation." *Parrish v. Ball*, 594 F.3d 993, 1001 (8th Cir. 2010) (quotation omitted); *accord Jackson*, 747 F.3d at 543.

### a. Failure to Investigate

The threshold inquiry in a § 1983 suit is identifying the specific constitutional right at issue. *Manuel*, 137 S. Ct. at 920. Plaintiff does not have a constitutional right to an investigation of his complaints. *See Vinyard v. Wilson*, 311 F.3d 1340, 1356 (11th Cir. 2002) ("[Plaintiff] does not cite, nor have we found, any federal or state court decision, statute, regulation or other source of law that gives [her] an entitlement to an internal investigation by the Sheriff's Office of her complaints of police brutality."); *see also Stringer v. Doe*, 503 F. App'x 888, 890-91 (11th Cir. 2013) (per curiam) ("Stringer also failed to state claims against the sheriff or deputy sheriff because Stringer did not have a substantive due process right to an internal investigation by the Sherriff's Department or law enforcement."); *Hayes v. Cty. of Sullivan*, 853 F. Supp. 2d 400, 433 (S.D.N.Y. 2012) ("[C]ourts in the Second Circuit have long held that an individual has no constitutionally protected right to an investigation by government officials of alleged wrongdoing by other government officials." (citing cases)). Because Plaintiff does not have a constitutional right to an investigation, the Court recommends that any claim against Johnson Piper, Richardson, Moser, Kniesel, Sadjak, Benoit, and Kosloski for failure to investigate the alleged wrongdoing be dismissed.

### b. First Amendment Retaliation

In Section III.C.2.a.i *supra*, the Court concluded that Plaintiff has alleged sufficient facts to state a claim for First Amendment retaliation against Kosloski. For the same

reasons, the Court finds that Plaintiff has sufficiently alleged the personal involvement of Kosloski based on her direct participation in the alleged constitutional violation. Accordingly, the Court recommends that Defendants' motion be denied with respect to Plaintiff's supervisory claim against Kosloski, and granted with respect to Johnson Piper, Richardson, Moser, Kniesel, Sadjak, and Benoit in connection with any retaliation.

### c.  Fourteenth Amendment Procedural Due Process

Similarly, in Section III.C.2.c.i *supra*, the Court concluded that Plaintiff has alleged sufficient facts to state a claim for violation of his Fourteenth Amendment right to procedural due process against Wyatt, Beavens, Gianinni, Fischer, Johnson, Brindamor, Aldrin, Lind, Goeglein, Korby, Schesso, Shorter, Cowell, and Cellelo in connection with his placement in the HSA on December 6 and December 7, 2016.

Plaintiff has alleged that Johnson Piper, Richardson, Moser, Kniesel, Sadjak, Benoit, and Kosloski "have refused to allow for hearings or implement procedures to protect [his] rights." (Compl. ¶ 12.)  In addition, Johnson Piper, in her role as the Commissioner of DHS, has a statutory duty to "adopt rules to govern the operation, maintenance, and licensure of secure treatment facilities operated by the Minnesota sex offender program or at any other facility operated by the commissioner, for a person committed as a sexual psychopathic personality or a sexually dangerous person." Minn. Stat. § 246B.04, subd. 1.  Richardson, in her role as the Executive Director, has a statutory duty to "establish a grievance policy and related procedures that address and attempt to resolve civilly committed sex offender concerns and complaints." Minn. Stat. § 246B.03, subd. 3(a).  "[S]tatutory duties may be sufficient to give rise to § 1983 liability when the

state actors are those who truly administer the challenged programs." *Pittman v. Jesson*, No. 12-cv-1410 (SRN/TNL), 2014 WL 4954286, at *15 (D. Minn. Sept. 30, 2014); *see Jackson*, 747 F.3d at 544.

Based on their alleged personal involvement in the denial of hearing procedures and these statutory duties, the Court recommends that Defendants' motion be denied with respect to Plaintiff's supervisory claim against Johnson Piper, Richardson, Moser, Kniesel, Sadjak, Benoit, and Kosloski in connection with his Fourteenth Amendment procedural due process claims.

### 4. Punitive Damages

Lastly, Defendants move for dismissal of Plaintiff's request for punitive damages, asserting that Plaintiff has not pleaded "plausible allegations of evil motive" or "reckless or callous indifference to [his] constitutional rights." (Defs.' Mem. in Supp. at 23.)

"Punitive damages may be awarded under 42 U.S.C. § 1983 'when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'" *Schaub v. VonWald*, 638 F.3d 905, 922 (8th Cir. 2011) (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)). "Proving reckless indifference requires evidence that the defendant acted in the face of a perceived risk that his or her actions would violate federal law." *McAdoo v. Martin*, 899 F.3d 521, 527 (8th Cir. 2018) (quotation omitted). "Punitive damages punish a defendant for outrageous, intentional, or malicious conduct, and deter similar extreme conduct in the future." *Schaub*, 638 F.3d at 922-23 (footnote omitted). "It is a question of fact whether a defendant's conduct was motivated by an evil motive or involves reckless indifference to

the federally protected rights of others." *Id.* Thus, "[w]hile an award of compensatory damages is mandatory upon a finding of liability, punitive damages are awarded or rejected in a particular case at the discretion of the factfinder once sufficiently serious misconduct by the defendant is shown." *Washington v. Denney*, 900 F.3d 549, 563 (8th Cir. 2018) (quotation omitted). "The factfinder focuses on the defendant's intent in determining whether to award punitive damages and whether the defendant's conduct is of the sort that calls for deterrence and punishment over and above that provided by compensatory awards." *Id.* at 563-64 (quotation omitted).

The Court has concluded that Plaintiff has stated claims for First Amendment retaliation; unreasonable searches under the Fourth Amendment; procedural due process violations under the Fourteenth Amendment; and supervisory liability in connection with his First and Fourteenth Amendment claims. The allegations regarding McGowan and Kosloski in response to the filing of the ID Lawsuit in which they were named as defendants are particularly troublesome, and it may be shown that their conduct is of the sort that justifies such damages. At the same time, a finding of liability under § 1983 does not necessarily mean that the defendant's conduct was of the sort calling for deterrence and punishment. *See id.* at 564. Given the inherently fact-specific nature of the inquiry, the Court recommends that Defendants' request to strike Plaintiff's request for punitive damages be denied without prejudice. At a later point in this litigation, Defendants can argue that the evidence does not support a finding of evil motive, intent, or reckless or callous indifference to the federally protected rights of others.

64

## IV. RECOMMENDATION

Based on the foregoing, and all of the files, records, and proceedings herein, **IT IS**

**HEREBY RECOMMENDED** that Defendants' Motion to Dismiss Plaintiff's Complaint

(ECF No. 24) be **GRANTED IN PART** and **DENIED IN PART** as follows:

1. Plaintiff's claims for monetary damages against Defendants in their official capacities be **DISMISSED WITHOUT PREJUDICE** for lack of jurisdiction.

2. Plaintiff's claims based on the Minnesota Constitution be **DISMISSED WITH PREJUDICE**.

3. Plaintiff's official-capacity claims be **DISMISSED WITHOUT PREJUDICE**.

4. Plaintiff's First Amendment claims be **DISMISSED WITHOUT PREJDUICE**, except for Plaintiff's retaliation claims against McGowan and Kosloski, including but not limited to Kosloski's participation in the search of Plaintiff's room.

5. Plaintiff's Fourth Amendment claims be **DISMISSED WITHOUT PREJUDICE**, except as to Wyatt, Beavens, Shorter, and Fischer based on the unclothed visual body searches on December 6 and 7, 2016.

6. Plaintiff's Fourteenth Amendment claims be **DISMISSED WITHOUT PREJDUICE**, except as to Wyatt, Beavens, Gianinni, Fischer, Johnson, Brindamor, Aldrin, Lind, Goeglein, Korby, Schesso, Shorter, Cowell, and Cellelo for procedural due process based on Plaintiff's placement in the HSA on December 6 and December 7, 2016.

7. Plaintiff's supervisory claims be **DISMISSED WITHOUT PREJUDICE**, except as to:

   a. Kosloski in connection with his First Amendment claims.

   b. Johnson Piper, Richardson, Moser, Kniesel, Sadjak, Benoit, and Kosloski in connection with his Fourteenth Amendment procedural due process claims.

8.  The request to strike Plaintiff's request for punitive damages be **DENIED WITHOUT PREJUDICE**.


Date: January__25____, 2019                         _____*s/ Tony N. Leung*_____
                                                    Tony N. Leung
                                                    United States Magistrate Judge
                                                    District of Minnesota


                                                    *Benson v. Piper et al.*
                                                    Case No. 17-cv-266 (DWF/TNL)


### NOTICE

**Filing Objections:**  This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set for in LR 72.2(c).