## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Michael D. Benson,                              Case No. 17-cv-266 (DWF/TNL)

            Plaintiff,                          **\*FILED UNDER SEAL\***

v.                                              **REPORT & RECOMMENDATION**

Emily Johnson Piper, *Comm. Of the Dept.*
*of Human Services*, *et al.*,

            Defendants.

---

Michael D. Benson, MSOP, 1111 Highway 73, Moose Lake, MN 55767 (pro se
Plaintiff); and

Ralph John Detrick, Assistant Attorney General, Minnesota Attorney General's Office,
445 Minnesota Street, Suite 1100, St. Paul, MN 55101 (for Defendants).

---

## I. INTRODUCTION

This matter is before the Court on Defendants' Motion for Summary Judgment,
ECF No. 95.  This motion has been referred to the undersigned for a report and
recommendation to the Honorable Donovan W. Frank, United States District Judge for
the District of Minnesota, pursuant to 28 U.S.C. § 636 and Local Rule 72.1.  For the
reasons set forth below, the undersigned recommends that Defendants' motion be
granted, and this matter be dismissed with prejudice.

## II. PROCEDURAL HISTORY

Michael D. Benson is involuntarily committed to the Minnesota Sex Offender
Program ("MSOP").  Benson brought this action against officers and employees of the

1

Minnesota Department of Human Services pursuant to 42 U.S.C. § 1983, asserting numerous violations of his civil rights. *See generally* Compl., ECF No. 1. Following dispositive motion practice, these claims remain against certain defendants in their individual capacities: retaliation against Defendants Wendy McGowan and Andrea Kosloski (Count I); unreasonable unclothed visual body searches on December 6 and 7, 2016, against Defendants Elizabeth Wyatt, Julianna Beavens, Brennan Shorter, and Ron Fischer[1] (Counts IV and V); procedural due process relating Benson's placement in MSOP's High Security Area ("HSA") on December 6 and 7 against Wyatt, Beavens, Fischer, and Shorter and Defendants Scott Gianinni, Nate Johnson, Sam Brindamor, Lori Aldrin, Bruce Lind, Mike Goeglein, Jana Korby, Kathryn Schesso, Travis Cowell, and Jenny Collelo (Count VIII);[2] and supervisory claims against Kosloski in connection with Count I and Kosloski and Defendants Emily Johnson Piper, Shelby Richardson, Kevin Moser, Terry Kneisel, Steve Sadjak, and Scott Benoit in connection with Count VIII. *Benson IV*, 2019 WL 1307883, at *10.

---

[1] Fischer passed away while this litigation was pending. *See generally* ECF No. 71. On March 4, 2019, Defendants filed and served a "Statement Noting Death Upon the Record," identifying Fischer's personal representative and the name and address of the personal representative's attorney. ECF No. 71 at 1. Fischer was sued in both his individual and official capacities. *See, e.g.*, Compl. ¶¶ 9-10. All official capacity claims were previously dismissed from this litigation. *Benson v. Piper*, No. 17-cv-266 (DWF/TNL), 2019 WL 1307883, at *10 (D. Minn. Mar. 22, 2019) [hereinafter *Benson IV*]. With respect to the claims against Fischer in his individual capacity, Rule 25 provides that such claims must be dismissed if a motion for substitution "is not made within 90 days after service of a statement noting the death." Fed. R. Civ. P. 25(a)(1). No motion for substitution has been made and the time to do so has passed. Because the Court does not reach the question of each defendant's personal involvement, *see infra* n.16, the Court merely notes the Rule 25 circumstance.

[2] Although Counts IV and V are styled as unreasonable seizure claims under the Fourth Amendment, the Court previously concluded that, to the extent Benson is challenging his placement in the HSA, the curtailment of any liberty interest resulting from such placement is more properly viewed in the context of a due process claim. *See Benson v. Piper*, No. 17-cv-266 (DWF/TNL), 2019 WL 2017319, at *18-24 (D. Minn. Jan. 25, 2019) [hereinafter *Benson III*], *adopting report and recommendation*, *Benson IV*, 2019 WL 1307883 (D. Minn. Mar. 22, 2019).

2

## III. FACTS

Benson was civilly committed to MSOP in 1993 and resides at MSOP's Moose Lake facility. Benson Dep. 10:2-3, 15-17, 11:21-12:6, Ex. A to Decl. of R.J. Detrick, ECF No. 105-1. MSOP's Moose Lake facility is a secure treatment facility.

The thrust of this lawsuit is that Defendants retaliated against Benson in various ways for filing *Benson v. Fischer*, No. 16-cv-509 (DWF/TNL) ("ID Lawsuit"), a separate action challenging the identification badges MSOP requires its clients to wear. *Benson III*, 2019 WL 2017319, at *1. The ID Lawsuit was filed in 2016 and served towards the end of June 2016. *See generally* Compl., ECF No. 1, Am. Compl., ECF No. 5, Summons Returned Executed, ECF No. 10, in No. 16-cv-509 (DWF/TNL). The events at issue in this lawsuit took place in June and December 2016.

### A. June 26, 2016 Incident

In June 2016, McGowan was employed as a security counselor at MSOP's Moose Lake facility. Decl. of Wendy McGowan ¶ 1, ECF No. 118. McGowan is a defendant in the ID Lawsuit. McGowan Decl. ¶ 4. On June 26, McGowan was assigned to work on Benson's living unit. McGowan Decl. ¶ 2; Benson Dep. 15:19-21.

McGowan did not typically work on Benson's unit. Benson Dep. 15:22-23; *see also* Dep. of Joel Brown 16:3-9, Ex. C to Detrick Decl., ECF No. 105-1; Dep. of Larry Shultz 13:1-3, Ex. D to Detrick Decl., ECF No. 105-1; Dep. of Jason Hayzlett 14:6-10, Ex. N to Detrick Decl., ECF No. 105-1. At the time, McGowan floated between different areas of the facility based on staffing needs. McGowan Decl. ¶ 2; Schultz Dep. 13:1-14; *see* Brown Dep. 16:3-18; Dep. of Ryan J. Mely 11:21-12:4, Ex. E to Detrick Decl., ECF

3

No. 105-1; Dep. of Joseph Hajek 11:18-12:9, Ex. G to Detrick Decl., ECF No. 105-1. Benson had previously had interactions with McGowan that were not positive, and he generally tried to avoid her. Benson Dep. 15:24-16:3, 19:1-19.

Kosloski was the director of Benson's living unit at the time and supervised McGowan. Decl. of Andrea Kosloski ¶ 1, ECF No. 113; Benson Dep. 16:13-15; 46:7-12. Kosloski is also a defendant in the ID Lawsuit. Kosloski Decl. ¶ 6. Benson believes it was Kosloski who assigned McGowan to work on the unit that day but admits this is "speculation." Benson Dep. 46:22-47:13. Kosloski "had no role in assigning . . . McGowan to work on [Benson's] unit . . . on June 26" and does not know how the assignment was made. Kosloski Decl. ¶ 2.

### 1. Benson's Account

MSOP has a rule that clients cannot be in one another's rooms. Benson Dep. 25:13-16; Schultz Dep. 13:22-14:3. On June 26, Benson was standing outside the room of another client, talking with him. Benson Dep. 24:22-25, 28:20-29:1; Schultz Dep. 13:22-14:4; Dep. of Michael Whipple 16:3-10, 19-24, 17:24-18:7, 19:22-23, Ex. H to Detrick Decl., ECF No. 105-1; Dep. of Rodger Robb 34:1-6, Ex. K to Detrick Decl., ECF No. 105-1. McGowan saw them talking and beelined in their direction, nearly knocking another client over. Benson Dep. 25:1-6; *see* Robb Dep. 34:7-11. Standing closely to Benson, McGowan told him that he needed to get out of the client's room. Benson Dep. 25:6-11; *see* Whipple Dep. 16:8-10, 18:24-19:2. Benson responded that he was not in the client's room and McGowan needed to back up. Benson Dep. 25:8-11.

4

McGowan became "enraged," telling Benson things like "who in the hell do you think you are," "we'll make your life hell," and "I'll give you something to sue about." Benson Dep. 25:11-12, 17-26:7, 18:6-13; *see* Benson Dep. 30:11-19. McGowan's face was "purple," "she was shaking," and she assumed a stance "almost like a chest bump or something like that, like she wanted to fight." Benson Dep. 25:24-26:12. A couple of times, McGowan came very close to touching Benson. Benson Dep. 26:13-14.

McGowan initiated the Incident Command System and members of a security team known as the "A-team" responded. Benson Dep. 26:17-27:1. Benson yelled to other MSOP staff members, trying to alert them of the situation. Benson Dep. 26:17-21. Benson held his hand out to stop McGowan from coming closer. Benson Dep. 26:21-24. Meanwhile, another client was calling McGowan derogatory names. Benson Dep. 29:7-16.

When the A-team arrived, they tried to get McGowan to step away and come to the staff desk, but she refused. Benson Dep. 26:25-27:5. Benson told McGowan to "quit cycling" and go to the staff desk. Benson Dep. 27:6-12. Benson subsequently went back up to his room. Benson Dep. 27:20-28:6, 29:2-6. Benson told one of the security counselors with the A-team that "he [wa]s being targeted by . . . McGowan and that other staff along with supervisors already knew about this." Incident Report 2016016987 at 1 [hereinafter IR 16987], Ex. A to Decl. of Anita Moonen, ECF No. 121-1.

Other clients witnessed McGowan confront Benson and their accounts largely corroborate Benson's, including that: (1) Benson was not in another client's room; (2) McGowan was rather combative towards Benson; (3) Benson did not use profanity or call

McGowan derogatory names; (4) McGowan remained where she was when MSOP staff members asked her to step away; and (5) other clients were calling McGowan derogatory names. *See, e.g.*, Benson Ex. A at A-2, ECF No. 136; Decl. of Rodger Robb, Benson Ex. B, ECF No. 136; Decl. of Larry Schultz, Benson Ex. C, ECF No. 136; Decl. of Jason Hayzlett, Benson Ex. D, ECF No. 136; Decl. of Michael Whipple, Benson Ex. E, ECF No. 136; Decl. of Geno Diego, Benson Ex. F, ECF No. 136; Decl. of Shawn Jamison, Benson Ex. G, ECF No. 136; Decl. of Dennis White, Benson Ex. H, ECF No. 136; Decl. of Joseph Hajek, Benson Ex. I, ECF No. 136; Decl. of Michael Tibbetts, Benson Ex. K, ECF No. 136; Decl. of Joel Brown, Benson Ex. L, ECF No. 136; Decl. of Brandon Keating, Benson Ex. M, ECF No. 136; Decl. of Scott Crampton, Benson Ex. N, ECF No. 136; *see also* Decl. of Arthur Karow, Benson Ex. J, ECF No. 136; *see generally* Dep. of Geno Diego, Ex. B to Detrick Decl., ECF No. 105-1; Brown Dep.; Schultz Dep.; Dep. of Dennis White, Ex. F to Detrick Decl., ECF No. 105-1; Hajek Dep.; Whipple Dep.; Dep. of Michael Tibbetts, Ex. J to Detrick Decl., ECF No. 105-1; Robb Dep.; Hayzlett Dep. The client with whom Benson had been talking heard McGowan tell Benson: "'I'll give you something to sue about.'"  Whipple Decl. ¶ 10; Whipple Dep. 19:3-5, 9-10, 14-15, 30:2-15.  Another client admitted he was the one that called McGowan derogatory names.  Hajek Decl. ¶¶ 6-7; Hajek Dep. 18:19-25, 21:9-15, 29:5-25; *see* Robb Dep. 48:20-50:5, 66:19-67:3.

Benson testified that the incident with McGowan "steeled [his] resolve" and he was determined to pursue the ID Lawsuit.  Benson Dep. 41:20-24.  Benson also admitted

during his deposition that this was his "last interaction with [McGowan]."  Benson Dep. 45:20-46:2.

### 2.  McGowan's Account

McGowan wrote an incident report describing her interaction with Benson on June 26.  *See* McGowan Decl. ¶ 3; *see generally* Incident Report 2016016971 [hereinafter IR 16971], Ex. A to Moonen Decl.  According to McGowan, she "observed . . . Benson standing inside the doorway" of a client's room, talking with the client.  IR 16971 at 1. McGowan asked Benson to step back.  IR 16971 at 1.  Benson stepped out of the doorway, loudly began to call McGowan derogatory names, and took "an aggressive stance."  IR 16971 at 1; *see* Incident Reports 2016016979 at 1 [hereinafter IR 16979], 2016016988 at 1 [hereinafter IR 16988], Ex. A to Moonen Decl.  McGowan "attempted to de-escalate the situation by asking . . . Benson to calm down," but he continued to call her names "us[ing] a louder tone of voice."  IR 16971 at 1; *see* IR 16979 at 1; IR 16988 at 1.

McGowan "initiated an Incident Command System for a client out of behavioral control," and the A-team responded.  IR 16971 at 1-2; IR 16979 at 1; IR 16987 at 1; IR 16988 at 1; Incident Report 2016016993 at 1 [hereinafter IR 16993], Ex. A to Moonen Decl.  Benson subsequently walked away from McGowan.  IR 16971 at 1.  Another client walking by "looked directly at [McGowan], and loudly referred to [her]" by a derogatory name.  IR 16971 at 1; *see* IR 16979 at 1; IR 16987 at 1; IR 16988 at 1; IR 16993 at 1.

According to McGowan, she did not "push [her] chest into [Benson], tell [him] that [she] would make his life a living hell, tell [him she] would give him something to

sue about, or in any way refer to the [ID Lawsuit]."  McGowan Decl. ¶ 3; *cf.* Decl. Scott

Benoit ¶ 3, ECF No. 99.

### 3. BER

McGowan issued Benson a major Behavioral Expectation Report[3] ("BER") for

"abuse/harassment" and disorderly conduct[4] as a result of the incident.  Benson Dep.

28:15-19; BER 13,516; July 6, 2016 Hearing Findings Report at 1; *see* Kosloski Decl.

¶ 2; *see also* IR 16971 at 2; IR 16979 at 1; IR 16987 at 1; IR 16988 at 1; IR 16993 at 1.

The Behavioral Expectations Handbook defines "abuse/harassment" as follows:

> Clients are expected to be respectful to others.  Abuse and
> harassment is prohibited, whether it is made directly or
> indirectly (e.g., through a third party).  Abuse and harassment
> includes, but is not limited to, derogatory or profane words,
> writings, remarks or gestures, name calling, yelling, and other
> acts intended as public expressions of disrespect and made to,
> [sic] or in the presence of others.

Behavioral Expectations Handbook at 8.  In relevant part, the Behavioral Expectations

Handbook defines "disorderly conduct" as follows:

> Clients are expected to conduct themselves appropriately, and
> refrain from engaging in any disruptive or nuisance conduct
> or any activity significantly interfering with the treatment
> environment.  Disorderly conduct includes, but is not limited
> to, activities having the potential of bringing about injury to
> self or another person or the potential of causing damage to
> property, or throwing any object or substance on a person.

---

[3] BERs are "generated when a behavioral expectation is violated" and can be issued "for any minor or major rule violation."  Behavioral Expectations Handbook at 4, 16, Ex. 1 to Decl. of Terrance Kneisel, ECF No. 112-1.

[4] This violation was originally listed as "disturbing others" but was subsequently amended to "disorderly conduct." *Compare* BER 13,516, Ex. C to Moonen Decl., ECF No. 121-3, *with* July 6, 2016 Hearing Findings Report, Ex. C to Moonen Decl.

Behavioral Expectations Handbook at 9. The BER was approved by Kosloski. BER 13,516; Kosloski Decl. ¶ 2.

Benson challenged the BER at a hearing before a Behavioral Expectations Unit panel. July 6, 2016 Hearing Findings Report at 1; Decl. of Steven Sayovitz ¶ 2, ECF No. 126; *see* Benson Dep. 29:21-30:1, 35:15-36:3, 13-38:5; *see also* Behavioral Expectations Handbook at 4, 17. As part of the hearing process, the Behavioral Expectations Unit panel reviewed the incident reports from June 26, watched a then-available[5] surveillance video of the incident, and heard from Benson. Sayovitz ¶¶ 3-4; July 6, 2016 Hearing Findings Report at 1. The BER was affirmed and Benson was placed on "Restriction Status 3" ("RS3") for 14 days.[6] July 6, 2016 Hearing Findings Report at 1; Sayovitz Decl. ¶ 5; *see* Behavioral Expectations Handbook at 6; *see also* Decl. of Terrance Kneisel ¶ 2, ECF No. 112; Benson Dep. 65:7-66:3.

### 4. Follow-Up

Kosloski received complaints from Benson and at least two other clients regarding McGowan's behavior. Kosloski Decl. ¶ 3; Incident Report 2016017351 at 1 [hereinafter IR 17351], Ex. B to Moonen Decl., ECF No. 121-2; Ex. Q at Q-2, Q-3, Q-13 to Q-14 to Detrick Decl., ECF No. 106; Robb Decl. ¶¶ 11-12. Kosloski noted in a subsequent

---

[5] At one point, there was video of the June 26 incident. *See, e.g.*, Benson Dep. 41:5-19; Defs.' Mem. in Supp. at 4 n.6 ("Defendants attempted to obtain the video of this incident but it appears to no longer exist."), ECF No. 97. The video did not have any audio. Benoit Decl. ¶ 3; Sayovitz Decl. ¶ 4. When the video had been available, it was viewed "multiple" times, including at least by the Behavioral Expectations Unit panel and Benoit. Decl. of Shelby Richardson ¶ 3, ECF No. 123; *see* Benoit Decl. ¶ 3; Sayovitz Decl. ¶ 4.

[6] Clients on RS3 are expected to remain in their "assigned room[s] except for a 10-minute window each hour, as designated by unit staff, to utilize the staff office, place phone calls, submit requests and use the janitor's closet." Behavioral Expectations Handbook at 6. While also restricted from certain other privileges/activities, "[c]lients may [generally] attend meals, medications and individually-assigned programming" while on RS3. Behavioral Expectations Handbook at 6.

incident report that McGowan "was given the feedback from [the] A-team during the debrief that after calling the [Incident Command System], she should have disengaged with . . . Benson and come to the front of the unit." IR 17351 at 1. Kosloski provided this report to her supervisor. Kosloski Decl. ¶ 3; *see* Benoit Decl. ¶¶ 2-3.

Richardson, who was then-executive director of MSOP, wrote a letter to Benson in response to a complaint he had made to Johnson Piper regarding the incident, informing him that his allegation of harassment by McGowan was "unfounded." Ex. 1 at 1 to Richardson Decl., ECF No. 123-1; *see* Benson Dep. 137:10-19. The letter stated that "[t]he video clearly show[ed Benson was] appropriately approached for room visiting on the unit, which is not allowed, when [Benson] aggressively stepped toward the staff confronting [him]. At no time did the staff 'run down the unit' to confront your room visiting violation or 'rub her breasts' on you as several feet remained between the two of you for the interaction." Ex. 1 at 1 to Richardson Decl.; *cf.* Sayovitz Decl. ¶ 4.

## B. Events Leading Up to HSA Placement

In or around early December 2016, Benson was again on RS3. *See, e.g.*, Benson Dep. 50:7-17; Incident Report 2016032694 at 1 [hereinafter IR 32694], Ex. A to Moonen Decl.; *see generally* BER 15,199 & Dec. 1, 2016 Hearing Findings Report, Ex. C to Moonen Decl. On December 3 and 4, Benson received BERs for engaging in activities that were restricted from clients on RS3 status. IR 32694 at 1; Incident Report

2016032768 at 1, Ex. A to Moonen Decl.; BER 15,376 & BER 15,382, Ex. C to Moonen Decl.[7]

On December 5, Benson left his unit and went to the gym, both of which were inconsistent with RS3. Incident Reports 2016032819 at 1 [hereinafter IR 32819], 2016032821 at 1 [hereinafter IR 32821], Ex. A to Moonen Decl.; Benson Dep. 53:11-16; *see* Behavioral Expectations Handbook at 6. Benson knew he was not permitted to go to the gym but went anyway. Benson Dep. 53:11-54:3. As a result, Benson received another BER and was placed on pre-hearing restriction status. IR 32819 at 1; IR 32821 at 1; BER 15,391, Ex. C to Moonen Decl.[8]

A client is placed on pre-hearing restriction status by a "supervisor to maintain safety or manage behavior prior to a hearing." Behavioral Expectations Handbook at 7 (quotation omitted); *see* Kneisel Decl. ¶ 3; Benson Dep. 65:7-66:7. Pre-hearing restriction status may be used "when a client continues to engage in repetitive rule-breaking behaviors" as a means of "contain[ing] the impact of the rule-breaking behaviors on the therapeutic community." Kneisel Decl. ¶ 3. Pre-hearing restriction status is more restrictive than RS3 but less restrictive than being placed in the HSA.[9] *See* Behavioral Expectations Handbook at 6-7; Kneisel Decl. ¶ 6. Benson was told that if he continued to violate MSOP rules he would be placed in the HSA. Benson Dep. 54:8-23.

---

[7] It appears that the BERs issued between December 3 and 6 were heard together by the Behavior Expectations panel on December 8, 2016. *See, e.g.*, Dec. 8, 2016 Hearing Findings Report, Ex. C at C-8, C-10, C-13, C-15, C-19, C-25, C-28 to Moonen Decl.

[8] *See supra* n.7.

[9] Clients on pre-hearing restriction status must not only remain in their rooms except for the 10-minute break period, but also keep their doors closed, eat their meals on the unit, and "be escorted for medications and all off-unit movement." Behavioral Expectations Handbook at 7. They are also restricted from other privileges/activities. Behavioral Expectations Handbook at 7.

Benson continued to repeatedly engage in activities inconsistent with his pre-hearing restriction status.  Over the course of the next approximately 24 hours, Benson was observed violating his pre-hearing restriction status at least eight times and received another six BERs.  Incident Reports 2016032832 at 1, 2016032836 at 1, 2016032847 at 1, 2016032883 at 1, 2016032905 at 1, 2016032918 at 1, 2016032930 at 1, 2016032953 at 1, 2016032968 at 1, 2016032969 at 1, 2016032972 at 1, Ex. A to Moonen Decl.; BERs 15,408, 15,406, 15,395, 15,393, 15,416, 15,411, Ex C. to Moonen Decl.; *see* Benson Dep. 58:1-62:8.  Benson testified that he knowingly violated his pre-hearing restriction status and was refusing to "recogniz[e]" it.  Benson Dep. 60:6-8; *see* Benson Dep. 84:5-86:3, 110:22-111:23.

### C. Placement in HSA

"When a client repeatedly violates pre-hearing restrictions, placement in [the] HSA may be necessary."  Kneisel Decl. ¶ 7.  This is because "[i]f a client were permitted to continually and openly violate staff directives and MSOP rules without consequences, . . . there is a serious risk that other clients would follow suit and the facility would become impossible to manage."  Kneisel Decl. ¶ 7; *see* Decl. Brennan Shorter ¶ 5, ECF No. 128.  Thus, "[t]he repeated violation of even seemingly minor restrictions such as using the microwave, if allowed to continue, can endanger the safety of staff and clients by leading to the violation of major safety rules."  Kneisel Decl. ¶ 7; *see* Shorter Decl. ¶ 5; Decl. of Elizabeth Wyatt ¶ 5, ECF No. 130.

Benson was placed on Protective Isolation Status in the HSA on both December 6 and December 7, for approximately 24 hours at a time, after he continued to violate his

pre-hearing restriction status. *See, e.g.*, Benson Dep. 93:23-94:2, 110:4-112:3, 128:18-25; Incident Reports 2016033017 at 1 [hereinafter IR 33017], 2016033225 at 1 [hereinafter IR 33225], Ex. A to Moonen Decl. On December 6, Benson received another BER and was placed on Protective Isolation Status in the HSA after he left his unit. Benson Dep. 66:8-13; IR 33017 at 1; Incident Reports 2016033007 at 1 [hereinafter IR 33007], 2016033030 at 1 [hereinafter IR 33030], Ex. A to Moonen Decl.; BER 15,429,[10] Ex. C to Moonen Decl.; *see* Incident Report 2016033011 at 1 [hereinafter IR 33011], Ex. A to Moonen Decl.

Benson returned to his unit on December 7. *See* Benson Dep. 94:6-25, 108:12-21; Incident Report 2016033181 at 1, Ex. A to Moonen Decl. Within approximately 90 minutes of his return, Benson violated his pre-hearing restriction status three times, received three BERs, and was again placed on Protective Isolation Status. IR 33225 at 1; Incident Reports 2016033186 at 1, 2016033193 at 1, 2016033222 at 1, Ex. A to Moonen Decl.; BERs 15,459, 15,464, 15,462, Ex. C to Moonen Decl.[11]

The A-team "typically escort[s] clients to [the] HSA" using "wrist restraints," or handcuffs. Decl. of Ann Linkert ¶ 6, ECF No. 117. Clients are then required to undergo an unclothed visual body search before being placed in the HSA. Linkert Decl. ¶ 2; Searches – Clients Policy at 2,[12] Ex. 1 to Linkert Decl., ECF No. 117-1; High Security Area Policy at 2,[13] Ex. 2 to Linkert Decl., ECF No. 117-2. Benson was subject to both

---

[10] *See supra* n.7.
[11] It appears that the BERs issued on December 7 were heard together by the Behavior Expectations Panel on December 22, 2016. *See, e.g.*, Dec. 22, 2016 Hearing Findings Report, Ex. C at C-31, C-34, C-37 to Moonen Decl.
[12] Policy No. 415-5010, effective September 6, 2016.
[13] Policy No. 415-5087, effective September 6, 2016.

procedures each time he was placed on Protective Isolation Status in the HSA.  *See, e.g.*, Benson Dep. 69:15-25, 112:4-22.

### 1.  Wrist Restraints/Handcuffs

MSOP staff are trained to apply handcuffs before taking a client to the HSA because "[a] client who is placed in [the] HSA as a result of dangerous and out of control behavior typically has refused to follow the directives of staff and the rules of the program."  Linkert Decl. ¶ 6.  The behavior of such clients "is generally unpredictable and it is very possible that they will continue to exhibit out of control behavior and refuse to comply with directives while being escorted to [the] HSA."  Linkert Decl. ¶ 6.  Handcuffs minimize this risk and protect the safety of staff and others while a client is being escorted to the HSA.  Linkert Decl. ¶ 6.

On December 6, Brindamor and another security counselor handcuffed Benson.  Benson Dep. 70:11-20, 92:7-13; Incident Report 2016032988 at 1 [hereinafter IR 32988], Ex. A to Moonen Decl.; *see* IR 33007 at 1; IR 33011 at 1; IR 33030 at 1.  Benson testified that Brindamor and the other security counselor "always act professional."  Benson Dep. 71:14-72:4.  The handcuffs were not too tight, and Benson was not physically injured during the process.  Benson Dep. 71:12-13, 72:5-7.

On December 7, three security counselors handcuffed Benson.  Incident Reports 2016033208 at 1, 2016033209 at 1 [hereinafter IR 33209], Ex. A to Moonen Decl.; *see* Benson Dep. 112:23-113:1, 115:12-21, 116:6-12; IR 33225 at 1; Incident Reports 2016033210 at 1 [hereinafter IR 33210], 2016033212 at 1 [hereinafter IR 33212], Ex. A to Moonen Decl.  The handcuffs were applied in the same professional manner as before;

they were not too tight, and Benson was not injured during the process.  Benson Dep. 114:10-18, 115:2-11.

### 2.  Unclothed Visual Body Searches

An unclothed visual body search, or strip search, is "the visual inspection by staff of the same gender of all body surfaces, requiring the person to remove his or her clothing."  Searches – Clients Policy at 1; *see* Searches – Clients Policy at 2 (search "will be performed by two or more staff of the same gender as the client").  MSOP staff

> are . . . trained not to remove [the handcuffs] until the client agrees to comply with [an unclothed visual body search] or, if . . . [a client] refuse[s] to comply, until it is determined that a staff-assisted [unclothed visual body search] is unnecessary or, if a staff-assisted [unclothed visual body search] is necessary, until the staff-assisted [unclothed visual body search] is completed.

Linkert Decl. ¶ 7.  This is done for safety reasons.  "[I]f a staff-assisted [unclothed visual body search] is necessary, then it is much safer for it to be done while the client is already in restraints and thus less able to actively resist" whereas, if the handcuffs were removed immediately and a staff-assisted search was necessary, "the client would potentially have to be placed in restraints again."  Linkert Decl. ¶ 7.

### a.  Purpose of Search

As explained by the security director of MSOP's Moose Lake facility, "it is vital for the safety of clients placed in [the] HSA and HSA staff that the area remain free of any objects that could be used to inflict injury on self or others."  Linkert Decl. ¶ 4; *see* Linkert Decl. ¶ 1.  "Even if a client placed in [the] HSA does not appear to be a threat to physically harm himself or others, that client needs to be subject to [an unclothed visual

body search] to make sure he does not bring an object into [the] HSA that another client could use for that purpose."  Linkert Decl. ¶ 4.  Pat-down and metal-detection searches are not sufficient as they may not catch items concealed in baggy clothing or body cavities.  Linkert Decl. ¶ 5.  Metal-detection searches will also "not detect non-metal items that could be used as weapons," including plastic pens (which have been used as weapons in the past) and "sharpened plastic toothbrush handles" (which have been found on multiple occasions).  Linkert Decl. ¶ 5.

### b.    Searches of Benson

Benson described the process of an unclothed visual body search as follows:

> You have to strip naked, then you have to turn around, bend over, lift up your feet, lift up – go through your mouth and everything, lift up your tongue, fold your ears up, go through your hair and whatnot.  And then they have the two staff are like at a 45-degree angle, both of them, and then the other staff are behind them and they're all watching this take place.

Benson Dep. 73:22-74:5.  Benson was not touched during the searches.  Benson Dep. 74:6-7, 118:6-8.  Benson estimated the entire process took approximately two minutes.  Benson Dep. 74:8-11, 118:14-17.  Benson complied with the unclothed visual body searches on both December 6 and 7.  IR 32988 at 1, IR 33011 at 1 (December 6); IR 33210 at 1, IR 33212 at 1, 33225 at 1 (December 7).

### i.    December 6

Benson testified that there were a number of MSOP staff members in the vicinity during the search on December 6, including Wyatt, a female staff member.  Benson Dep. 74:12-22, 75:13-22, 76:1-77:23; *see* Benson Dep. 44:2-5, 72:8-11.  Wyatt was not one of

16

the two staff members conducting the search itself but standing with a group of staff members outside the room's open door.  Benson Dep. 72:22-77:16, 88:20-89:9.  Benson testified that he did not see Wyatt looking in during the search.  Benson Dep. 77:17-20.

When asked if the MSOP staff members conducting the search behaved sadistically, Benson testified that "the majority of them were acting as professional as they could, given the circumstances and the situation they were placed into."  Benson Dep. 78:25-79:6.  Benson was not physically injured during the unclothed visual body search but felt humiliated.  Benson Dep. 77:24-78:19.  Benson also testified that it was unprofessional not to follow policy.  Benson Dep. 79:15-21.

### ii.    December 7

Two male security counselors conducted the unclothed visual body search of Benson on December 7.  IR 33209 at 1; Benson Dep. 114:19-23, 118:1-5; *see* IR 33212 at 1; Benson Dep. 117:8-21.   There was again a group of MSOP staff members, approximately "five or six people," standing outside the door.  Benson Dep. 114:23-115:1.  Benson agreed that the search was conducted professionally, saying "if you're going to do a[n unclothed visual body search], that's the way to do it."  Benson Dep. 118:9-13.  Again, Benson was not physically injured during the unclothed visual body search but felt humiliated.  Benson Dep. 118:18-23.

### D.  The HSA

The HSA is "an area . . . monitored more frequently with specialized safety procedures to reduce the risk of harm to clients, staff and the public."  High Security Area Policy at 1.

### 1. Conditions in the HSA

Benson described the HSA as "solitary confinement." Benson Dep. 80:8-20. The room Benson was placed in had "a toilet, a concrete slab with a mattress on it and that's it." Benson Dep. 80:8-20. The room was about the same size as Benson's room on the living unit. Benson Dep. 81:7-9. The primary difference was that Benson was not allowed to have his personal property with him in the HSA. Benson Dep. 80:21-23. Benson was also given a "jail uniform." Benson Dep. 71:2-11; *see also* Benson Dep. 73:2-21.

### 2. Protective Isolation Status

A client placed in the HSA must be on one or more of three "statuses." High Security Area Policy at 1; *see* PI Status Policy at 2 ("Protective Isolation Status will be implemented in the area designed as a[n HSA] whenever feasible."),[14] Ex. F to Moonen Decl., ECF No. 120-1. As relevant here, Benson was placed in the HSA on Protective Isolation Status both times. *See generally* Dec. 6, 2016 PI Status & Immediate Review, Dec. 7, 2016 PI Status & Immediate Review, Ex. D to Moonen Decl., ECF No. 121-4.

#### a. Placement on Protective Isolation Status

"A client is considered to be on Protective Isolation [S]tatus when the client is placed in a room from which the client is not able or permitted to exit, as a way of defusing or containing dangerous behavior that is uncontrollable by any other means." PI Status Policy at 1. "Dangerous behavior" is defined as "behavior that compromises the safety or security of the treatment program, or disrupts the order of the program to the

---

[14] Policy No. 415-5085, effective May 3, 2016.

18

extent that safety or security may be jeopardized." PI Status Policy at 1. "Security" is defined as "the measures necessary to achieve the management and accountability of clients of the facility, staff, and visitors, as well as property of the facility." PI Status Policy at 1. Behavior that is "uncontrollable by any other means" is behavior that has been "unresponsive to less restrictive alternatives" and "include[es] exhibiting behavior that the person is unable or unwilling to control." PI Status Policy at 1.

Before placing a client on Protective Isolation Status, MSOP staff are directed to "attempt less restrictive alternatives" in an effort "to defuse the dangerous behavior." PI Status Policy at 1. These alternatives must be documented on the Protective Isolation Status placement form. PI Status Policy at 1.

### b.    Review of Protective Isolation Status

Placement on Protective Isolation Status is subject to a number of procedural requirements and a series of reviews. *See* PI Status Policy at 2-6. These include: the initial placement and an immediate review; a review within 4 hours of placement; and a review after 24 hours. PI Status Policy at 2-3. Every 7 days, a panel "review[s] the documentation regarding clients who have been placed on Protective Isolation Status." PI Status Policy at 5. A client may request to be present at the panel review. PI Status Policy at 5. During the panel review, "[t]he client will have the opportunity to present evidence to the [panel] to explain why the Protective Isolation Status is believed to be unwarranted." PI Status Policy at 5. A client may also "request that an MSOP facility director review [the panel's] determination." PI Status Policy at 5.

### c.    Protective Isolation Status on December 6

On December 6, Benson was told that he was being placed in the HSA because he "was out of behavioral control."  Benson Dep. 70:1-6.  Benson was placed on Protective Isolation Status in the HSA at approximately 11:30 a.m. by Wyatt.  Dec. 6, 2016 PI Status & Immediate Review at 1; Wyatt Decl. ¶ 2.

### i.    Placement & Immediate Review

Wyatt completed the Protective Isolation Status Placement and Immediate Review form for Benson.  *See generally* Dec. 6, 2016 PI Status & Immediate Review.  Wyatt stated that Benson walked off the unit while on pre-hearing restriction status and this was the latest in Benson's repeated refusal to comply with his pre-hearing restriction status. Dec. 6, 2016 PI Status & Immediate Review at 1.  Wyatt chronicled the numerous times MSOP staff asked Benson to follow the applicable restrictions, Benson's continued defiance, the BERs, and loss of break times.  Dec. 6, 2016 PI Status & Immediate Review at 1-2.

Wyatt explained that "Benson's behavior[] disrupts the therapeutic environment of his living unit as well as other areas.  Unit staff have met with [him] as well as clinical staff to encourage his compliance with his restriction status allowing him time to control his behaviors but his repeative [sic] behaviors continued and remain uncontrollable." Dec. 6, 2016 PI Status & Immediate Review at 2; *see* Wyatt Decl. ¶ 4.  Benson was placed in the HSA because "staff had exhausted all less restrictive options and . . . Benson continue[d] to completely disregard following any [p]re-[h]earing restriction status."  Dec. 6, 2016 PI Status & Immediate Review at 2; *see* Wyatt Decl. ¶ 4.

20

Benson's placement was approved by Beavens, the officer of the day. Dec. 6, 2016 PI Status & Immediate Review at 4; *see* PI Status Policy at 1 ("The officer of the day . . . will ensure the completion of the documentation identifying why the Protective Isolation was initiated and what less restrictive options were attempted."). Benson received a copy of this placement document along with a form in which he could request review of his placement. Dec. 6, 2016 PI Status & Immediate Review at 4; Benson Dep. 82:1-7.

### ii.    4-Hour Review

Fischer completed the 4-hour review at 3:15 p.m. Dec. 6, 2016 PI 4-Hour Status Review at 2, Ex. D to Moonen Decl.; *see* PI Status Policy at 2-3 (officer of the day reviews placement within four hours). Fischer noted that Benson had "continually refused to follow his pre-hearing restriction and left the unit." Dec. 6, 2016 PI 4-Hour Status Review at 1. Fischer also noted that Benson "was given many directives and less restrictive alternatives which he chose not to follow." Dec. 6, 2016 PI 4-Hour Status Review at 1. Fischer determined that Protective Isolation Status was warranted and should be continued. Dec. 6, 2016 PI 4-Hour Status Review at 2.

Gianinni and Johnson are also listed as having participated in the review. Dec. 6, 2016 PI 4-Hour Status Review at 2; Decl. of Scott Gianinni ¶ 2, ECF No. 108; Decl. of Nathan Johnson ¶ 2, ECF No. 110. The extent and nature of their participation in the review is not clear from the record. *See* Gianinni Decl. ¶ 4; Johnson Decl. ¶ 3.

### iii.    24-Hour Review & Release

At 10:15 a.m. on December 7, less than 24 hours after Benson's placement, Aldrin, the group supervisor/officer of the day, completed the 24-hour review. Dec. 7, 2016 PI 24-Hour Status Review at 2, Ex. D to Moonen Decl.; *see* PI Status Policy at 3 (officer of the day reviews placement after 24 hours). Aldrin determined that Protective Isolation Status was warranted but should be discontinued at this time. Dec. 7, 2016 PI 24-Hour Status Review at 2. Benson's Protective Isolation Status was discontinued at approximately 11:30 a.m. on December 7. Dec. 7, 2016 Discontinuation of PI Status at 2, Ex. D to Moonen Decl. Aldrin noted that discontinuation was appropriate because Benson's "behavior, activities, or actions no longer threaten the safety and security of the facility" and he "ha[d] remained in behavioral control since placement in the [HSA]." Dec. 7, 2016 Discontinuation of PI Status at 1.

Brindamor and Lind are also listed as having participated in the 24-hour review. Dec. 7, 2016 PI 24-Hour Status Review at 2; Decl. of Bruce Lind ¶ 2, ECF No. 115. The extent and nature of Brindamor's participation in the review is not clear from the record. Lind only provided copies of documents to Benson and "had no role in deciding whether [his] placement in the [HSA] on Protective Isolation Status was warranted, whether it complied with MSOP policy, or whether his HSA placement should be continued." Lind Decl. ¶ 4.

### iv.    Panel Review

Benson's December 6 placement on Protective Isolation Status was reviewed by the panel on December 7, the same day it was discontinued. *See generally* Dec. 7, 2016

22

PI Panel Review, Ex. D to Moonen Decl.  Goeglein, Korby, and Schesso were on the

panel.  Dec. 7, 2016 PI Panel Review at 3.  With respect to Benson's participation in the

review, the panel noted:

> Mr. Benson provided a written statement identifying that he
> had not "attacked or threatened anyone" and his perception
> [was] that [the HSA] was being utilized for "staff
> convenience" for his refusal to accept his RS3 "punishments."
> As he requested to attend the panel review, Mr. Benson was
> invited to attend.  Due to his out of control behaviors prior to
> the panel review and his ultimate return to the [HSA], he was
> not allowed to attend the meeting.

Dec. 7, 2016 PI Panel Review at 1; *see* Benson Dep. 97:22-98:17.

The panel determined that Benson's placement on Protective Isolation Status in

the HSA on December 6 was warranted and in accordance with policy.  Dec. 7, 2016 PI

Panel Review at 1-2.  The panel additionally noted:

> Mr. Benson, although you did not directly threaten harm to
> staff or clients, your behavior was disruptive to the
> therapeutic environment of the living unit and facility as a
> whole.  It was clearly documented you made statements
> identifying you would not be complying with your [p]re-
> [h]earing [s]tatus restrictions.   Staff offered you many
> alternatives prior to placement in the [HSA]; thus
> demonstrating your behaviors were uncontrollable by any
> other means and were a threat to the security and operation of
> the facility due to your lack of cooperation with
> rules/supervision.
>
> Additionally, the panel would like to recognize staff for
> clearly documenting the least restrictive alternatives offered
> over a period of days to help provide Mr. Benson the
> opportunity to manage his behaviors on his own, which he did
> not utilize.

Dec. 7, 2016 PI Panel Review at 2.

### d.    Protective Isolation Status on December 7

Benson was placed on Protective Isolation Status in the HSA by Shorter at approximately 1:45 p.m. on December 7.  Dec. 7, 2016 PI Status & Immediate Review at 1; Shorter Decl. ¶ 2.

### i.    Placement & Immediate Review

Shorter completed the Protective Isolation Status Placement and Immediate Review form for Benson.  *See generally* Dec. 7, 2016 PI Status & Immediate Review. Shorter noted that Benson had returned to his living unit from the HSA at approximately 12:15 p.m.  Dec. 7, 2016 PI Status & Immediate Review at 1.  Shorter summarized the history of Benson's "escalating behavior throughout the past week" and chronicled the several requests made by MSOP staff for Benson to comply with his pre-hearing restriction status, Benson's persistent failure to do so, and the BERs issued since his return to the living unit just over an hour ago.  Dec. 7, 2016 PI Status & Immediate Review at 1-2; *see* Shorter Decl. ¶ 2.

As for the events immediately preceding Benson's placement on Protective Isolation Status in the HSA, Shorter explained that Benson continued to violate his pre-hearing status by using the unit computer during his breaktime without having submitted a request to do so.  Dec. 7, 2016 PI Status & Immediate Review at 1; *see* Shorter Decl. ¶ 3.  Benson was asked at least three times to log off of the computer.  Dec. 7, 2016 PI Status & Immediate Review at 1; *see* Shorter Decl. ¶ 3.  After he finally did, Benson asked when he was going to be taken to the HSA.  Dec. 7, 2016 PI Status & Immediate Review at 1; *see* Shorter Decl. ¶ 3.  MSOP "[s]taff told . . . Benson that he would not be

going to [the] HSA as he was still on his breaktime and was complying with staff directives." Dec. 7, 2016 PI Status & Immediate Review at 1-2; *see* Shorter Decl. ¶ 3. Benson then went back and started using the unit computer again. Dec. 7, 2016 PI Status & Immediate Review at 2; *see* Shorter Decl. ¶ 3. Benson refused to log off when asked and, when "then asked if he was refusing a staff directive at this time," Benson "replied 'Yes.'" Dec. 7, 2016 PI Status & Immediate Review at 2; *see* Shorter Decl. ¶ 3. Benson was placed on Protective Isolation Status in the HSA "due to [his] escalating behavior and refusal to comply with staff directives." Dec. 7, 2016 PI Status & Immediate Review at 2; *see* Shorter Decl. ¶ 3.

Benson's placement was approved by Fischer. Dec. 7, 2016 PI Status & Immediate Review at 3; *see* PI Status Policy at 1. Benson received a copy of this placement document along with a form in which he could request review of his placement. Dec. 7, 2016 PI Status & Immediate Review at 3; Benson Dep. 119:1-13

### ii. Benson's Review Request

Benson completed the review request form. *See generally* Dec. 7, 2016 PI Status Review Request, Ex. D to Moonen Decl.; *see also* Benson Dep. 122:25-12. Benson checked boxes indicating that he wanted "[t]o provide written evidence/explanation to the Officer of the Day prior to the Four Hour Review" and was requesting "[t]o appear in person (if in behavioral control) or provide written evidence" to the review panel. Dec. 7, 2016 PI Status Review Request at 1. Benson wrote: "Again, I was not exhibiting dangerous, assaultive or threatening behavior. The HSA was used again for staff convenience." Dec. 7, 2016 PI Status Review Request at 1.

25

### iii.    4-Hour Review

Fischer completed the 4-hour review at approximately 5:15 p.m.  Dec. 7, 2016 PI 4-Hour Status Review at 2, Ex. D to Moonen Decl.  While a client's comments and any request for review of placement are to be included in the 4-hour review, Benson's request for review was not noted.  Dec. 7, 2016 PI 4-Hour Status Review at 1.  Among other things, Fischer noted that "Benson continued to refuse to follow his pre-hearing restriction once he returned to the unit" from the HSA and "was placed back into the [HSA] under Protective Isolation [S]tatus due to his unwillingness to control his behavior."  Dec. 7, 2016 PI 4-Hour Status Review at 1.  Fischer determined that Protective Isolation Status was warranted and should be continued.  Dec. 7, 2016 PI 4-Hour Status Review at 2.

Gianinni and Cowell are also listed as having participated in the 4-hour review. Dec. 7, 2016 PI 4-Hour Status Review at 2; Gianinni Decl. ¶ 3; Decl. of Travis Cowell ¶ 2, ECF No. 103.  The extent and nature of their participation in the review is not clear from the record.  *See* Gianinni Decl. ¶ 4; Cowell Decl. ¶ 3.

### iv.    24-Hour Review & Release

At approximately 1:45 p.m. on December 8, approximately 24 hours after Benson's placement, Beavens completed the 24-hour review.  Dec. 8, 2016 PI 24-Hour Status Review at 3, Ex. D to Moonen Decl.; *see* PI Status Policy at 3.  This time Benson's request for review was noted.  Dec. 8, 2016 PI 24-Hour Status Review at 1.  Beavens determined that Protective Isolation Status had been warranted but would be discontinued at this time.  Dec. 8, 2016 PI 24-Hour Status Review at 2; *see* Dec. 8, 2016

Discontinuation of PI Status at 1-2, Ex. E to Moonen Decl., ECF No. 121-5. Beavens noted that, while Benson "ha[d] been in behavioral control in [the HSA]," he would be moved to another living unit due to his continued refusal to comply with his pre-hearing restriction status. Dec. 8, 2016 PI 24-Hour Status Review at 1; *see* Dec. 8, 2016 PI 24-Hour Status Review at 2; Dec. 8, 2016 Discontinuation of PI Status at 1; Incident Report 2016033336 at 1, Ex. A to Moonen Decl.; *see also* Benson Dep. 126:9-127:18.

Collelo is also listed as having participated in the 24-hour review. Dec. 8, 2016 PI 24-Hour Status Review at 2; Decl. of Jenny Collelo ¶ 2, ECF No. 101. Collelo's role was limited to providing Benson with copies of documents. Collelo Decl. ¶ 4; *see* Dec. 8, 2016 PI 24-Hour Status Review at 3.

### v.    Panel Review

Benson's December 7 placement on Protective Isolation Status was reviewed by the panel on December 14. *See generally* Dec. 14, 2016 PI Panel Review, Ex. D to Moonen Decl. The panel again consisted of Goeglein, Korby, and Schesso. Dec. 14, 2016 PI Panel Review at 3. The panel referenced the written statement Benson had provided in his request for review and noted that, although Benson requested and was granted permission to attend the review, he "did not arrive at the scheduled time to provide input to the panel." Dec. 14, 2016 PI Panel Review at 1; *see* Benson Dep. 131:12-21.

The panel determined that Benson's placement on Protective Isolation Status in the HSA on December 7 was warranted and in accordance with policy. Dec. 14, 2016 PI Panel Review at 1-2. The panel noted:

27

> In response to Mr. Benson's comments, as noted previously
> your behavior was disruptive to the therapeutic environment
> of the living unit and facility as a whole. You were offered
> numerous opportunities to manage your behaviors and chose
> not to utilize those opportunities. Due to this, your behaviors
> were determined to be uncontrollable by any other means.

Dec. 14, 2016 PI Panel Review at 1. The panel again "recognize[d MSOP] staff for

clearly documenting the less restrictive alternatives offered to [Benson] prior to the

decision to place him in the [HSA]." Dec. 14, 2016 PI Panel Review at 2.

## IV. ANALYSIS

Defendants have moved for summary judgment on Benson's remaining claims.

Under Rule 56, courts "shall grant summary judgment if the movant shows that there is

no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a). The movant "bears the initial responsibility of

informing the district court of the basis for its motion," and must identify "those portions

of [the record] . . . which it believes demonstrate the absence of a genuine issue of

material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quotation omitted);

*see* Fed. R. Civ. P. 56(c)(1)(A). "Only disputes over facts that might affect the outcome

of the suit under the governing law will properly preclude the entry of summary

judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A dispute is

genuine if the evidence is such that it could cause a reasonable jury to return a verdict for

either party." *Pena v. Kindler*, 187 F. Supp. 3d 1070, 1076 (D. Minn. 2016) (citing

*Anderson*, 477 U.S. at 252). "On a motion for summary judgment, the court views all

evidence and inferences in a light most favorable to the nonmoving party." *Id.* (citing *Anderson*, 477 U.S. at 255).

"To defeat a motion for summary judgment, a party may not rest upon allegations, but must produce probative evidence sufficient to demonstrate a genuine issue for trial." *Davenport v. Univ. of Ark. Bd. of Trs.*, 553 F.3d 1110, 1113 (8th Cir. 2009) (citing *Anderson*, 477 U.S. at 247-49); *see also Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) ("The nonmovant 'must do more than simply show that there is some metaphysical doubt as to the material facts,' and must come forward with 'specific facts showing that there is a genuine issue for trial.'") (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). "[T]here is no genuine issue for trial if 'the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party.'" *Ball v. City of Lincoln*, 870 F.3d 722, 727 (8th Cir. 2017) (quoting *Torgerson*, 643 F.3d at 1042).

Summary judgment is "properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp.*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1); *accord Torgerson*, 643 F.2d at 1043. The Court recognizes that Benson is proceeding pro se. While pro se plaintiffs are entitled to have their pleadings liberally construed, "Rule 56 remains applicable." *Sisney v. Kaemingk*, 886 F.3d 692, 697 (8th Cir. 2018) (quotation omitted).

A. **Section 1983**

Benson's claims arise under 42 U.S.C. § 1983, which provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." "The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Wyatt v. Cole*, 504 U.S. 158, 161 (1992).

Civilly committed individuals like Benson are not prisoners and are "entitled to 'more considerate treatment and conditions of confinement.'" *Senty-Haugen v. Goodno*, 462 F.3d 876, 886 (8th Cir. 2006) (quoting *Youngberg v. Romeo*, 457 U.S. 307, 322 (1982)). At the same time, because Benson "has been civilly committed to state custody as a dangerous person, his liberty interests are considerably less than those held by members of free society." *Id.* Further, while civilly committed individuals are not "prisoner[s] per se," the Eighth Circuit Court of Appeals has held that their "confinement is subject to the same safety and security concerns as that of a prisoner." *Beaulieu v. Ludeman*, 690 F.3d 1017, 1028 (8th Cir. 2012) (quotation omitted); *accord Ingrassia v. Schafer*, 825 F.3d 891, 897 (8th Cir. 2016). Accordingly, when evaluating the constitutional claims of civilly committed individuals, courts have looked to the prison context and found analogous the rights retained by pretrial detainees. *See, e.g.*, *Youngberg*, 457 U.S. at 319-20; *Hall v. Ramsey Cty.*, 801 F.3d 912, 919 (8th Cir. 2015);

30

*Beaulieu*, 690 F.3d at 1025, 1028; *Serna v. Goodno*, 567 F.3d 944, 948-49 (8th Cir. 2009). With this in mind, the Court turns to Benson's remaining claims.

### B. Retaliation (Count I)

In Count I, Benson claims he was harassed and targeted by MSOP staff after filing the ID Lawsuit in an effort to chill him from exercising his First Amendment rights. This claim remains only with respect to McGowan and Kosloski.

"It is well established that the right to file a legal action is protected under the First Amendment." *Spencer v. Jackson Cty. Mo.*, 738 F.3d 907, 911 (8th Cir. 2013); *see Evenstad v. Herberg*, 994 F. Supp. 2d 995, 1001 (D. Minn. 2014) ("[C]ivilly committed persons retain their First Amendment Rights to exercise the freedom of speech and to seek redress of grievances.").

#### 1. June 26 BER

The June 26 BER for abuse/harassment and disorderly conduct was issued by McGowan and approved by Kosloski, both of whom are defendants in the ID Lawsuit. Defendants assert any retaliation claim premised on the June 26 BER fails because the Behavioral Expectations Unit panel found, based on some evidence, that Benson violated MSOP's rules.

"An inmate may maintain a cause of action for retaliatory discipline under 42 U.S.C. § 1983 where a prison official files disciplinary charges in retaliation for an inmate's exercise of constitutional rights." *Hartsfield v. Nichols*, 511 F.3d 826, 829 (8th Cir. 2008); *accord Sanders v. Hobbs*, 773 F.3d 186, 190 (8th Cir. 2014). "[C]laims of retaliation fail[, however,] if the alleged retaliatory conduct violations were issued for the

actual violation of a prison rule." *Hartsfield*, 511 F.3d at 829; *accord Sanders*, 773 F.3d at 190. "Thus, a defendant may successfully defend a retaliatory discipline claim by showing 'some evidence' the inmate actually committed a rule violation." *Hartsfield*, 511 F.3d at 829 (citing *Goff v. Burton*, 7 F.3d 734, 738-39 (8th Cir. 1993)); *accord Sanders*, 773 F.3d at 190. In the Eighth Circuit, "a report from a correctional officer, even if disputed by the inmate and supported by no other evidence, legally suffices as 'some evidence' upon which to base a prison disciplinary violation, if the violation is found by an impartial decisionmaker." *Hartsfield*, 511 F.3d at 831; *accord Sanders*, 773 F.3d at 190; *see, e.g.*, *Fulghum v. Allen*, 626 F. App'x 653, 654 (8th Cir. 2015) (per curiam); *Bandy-Bey v. Crist*, 578 F.3d 763, 766 (8th Cir. 2009) (per curiam); *Griggs v. Norris*, 297 F. App'x 553, 555 (8th Cir. 2008) (per curiam).

"[T]he critical inquiry . . . is whether the prison disciplinary committee ultimately found based upon some evidence that the prisoner committed the charged violation of the prison regulations." *Sanders*, 773 F.3d at 190 (quotation omitted). The Supreme Court has explained that the "some evidence" standard looks to "'whether there is any evidence in the record that could support the conclusion reached by the disciplinary board,'" and "'does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence.'" *Id.* (quoting *Superintendent v. Hill*, 472 U.S. 445, 455-56 (1985)). Here, the Behavioral Expectations Unit panel reviewed the incident reports from June 26, watched the surveillance video, and heard Benson's account of what happened. The panel found that Benson had violated MSOP's rules and affirmed the BER. Under binding precedent, the incident reports authored by

32

McGowan, Kosloski, and another security counselor describing Benson's interaction with McGowan on June 26 "alone" are sufficient to support the BER and that Benson was engaged in confrontational, disruptive, and disrespectful behavior in violation of MSOP's rules. *Sanders*, 773 F.3d at 190; *see Bandy-Bey*, 578 F.3d at 766; *Hartsfield*, 511 F.3d at 831. This is true even though Benson disagrees with their accounts. *Hartsfield*, 511 F.3d at 831. Moreover, Benson has not proffered any evidence suggesting the panel was impartial. *See Bandy-Bey*, 578 F.3d at 766.

Benson contends that disputes of material fact remain as to whether he was engaged in room-visiting in the first place and whether he used derogatory language when speaking with McGowan. But, Benson himself does not dispute that the June 26 BER was not issued for room-visiting. Benson's Mem. in Opp'n at 5 ("The BER written by Def. McGowan and approved by Def. Kosloski which alleges a violation of being in another client[']s cell, did not cite that specific violation."), ECF No. 135. Benson's remaining arguments take issue with the investigation (or lack thereof) by the Behavioral Expectations Unit and weighing of the evidence. But, as stated above, "in reviewing whether the 'some evidence' standard has been satisfied, [courts] are not to make an independent assessment of the credibility of witnesses or weigh the evidence." *Sanders*, 773 F.3d at 191 (quotation omitted).

In sum, because there is "some evidence" to support the decision of the Behavioral Expectations Unit panel to sustain the June 26 BER, there is also "some evidence" Benson violated MSOP's rules against abuse/harassment and disorderly conduct. *Id.* ("Because there is 'some evidence' to support Drayer's decision affirming the charge

against Sanders, there is also 'some evidence' Sanders committed the charged violation."). Accordingly, Benson's retaliatory-discipline claim arising out of the June 26 BER fails as a matter of law. *Id.*; *see also Bandy-Bey*, 578 F.3d at 766; *Hartsfield*, 511 F.3d at 831.

### 2.  Other Purported Retaliation by McGowan and Kosloski

Benson also claims that McGowan and Kosloski retaliated against him in other ways, including the assignment of McGowan to Benson's unit on June 26, a lack of follow-up by Kosloski, and verbal threats made by McGowan.

> To establish a § 1983 claim for retaliation in violation of the First Amendment, a plaintiff must allege (1) that he engaged in a protected activity, (2) that the defendants responded with adverse action that would chill a person of ordinary firmness from continuing in the activity, and (3) that the adverse action was motivated at least in part by the exercise of the protected activity.

*Beaulieu*, 690 F.3d at 1025 (quotation omitted); *see Benson v. Piper*, No. 16-cv-509 (DWF/TNL), 2016 U.S. Dist. LEXIS 190502, at *17 (D. Minn. Dec. 8, 2016), *adopting report and recommendation as modified*, 2017 U.S. Dist. LEXIS 158017 (D. Minn. Mar. 31, 2017) [hereinafter *Benson II*]; *Evenstad*, 994 F. Supp. 2d at 1000; *see also Banks v. Ludeman*, No. 08-cv-5792 (MJD/JJK), 2010 WL 4822892, at *16 (D. Minn. Oct. 4, 2010) (applying three-prong test for prison retaliatory discipline claim to retaliation claim brought by MSOP client), *adopting report and recommendation*, 2010 WL 4822888 (D. Minn. Nov. 22, 2010).

"The retaliatory conduct itself need not be a constitutional violation; the violation is acting in retaliation for the exercise of a constitutionally protected right." *Spencer*, 738

34

F.3d at 911 (quotation omitted). Thus, "[i]n order to be actionable, a defendant's conduct need not be egregious; petty harassment and ridicule, for example, may suffice." *Evenstad*, 994 F. Supp. 2d at 1001.

### a. Kosloski

Benson attributes the assignment of McGowan to his living unit on June 26 to Kosloski. *See, e.g.*, Benson's Answers to Interrogs. at 4, 17, Ex. P to Detrick Decl., ECF No. 105-1; Benson Dep. 46:3-47:11. Kosloski states that she had no role in the assignment. At his deposition, Benson openly admitted that he did not know how McGowan was assigned to his unit that day and Kosloski's involvement was speculation on his part. Benson Dep. 16:20-23, 47:3-13. Conjecture and speculation are not enough to show a genuine dispute of material fact. *Zayed v. Associated Bank, N.A.*, 913 F.3d 709, 720 (8th Cir. 2019); *see Woodworth v. Hulshof*, 891 F.3d 1083, 1088 (8th Cir. 2018) ("Evidence, not contentions, avoids summary judgment . . . .") (quotation omitted). The undisputed evidence in the record is that Kosloski had no role in assigning McGowan to Benson's unit on June 26.

Benson also testified that he was not aware of anything Kosloski did to follow up on complaints she received about McGowan's conduct on June 26. Benson Dep. 47:18-48:6. The undisputed evidence in the record shows that Kosloski in fact prepared a report for her supervisor regarding the incident after receiving the complaints. And, to the extent Benson claims Kosloski should have done more, he again openly admitted during his deposition that he could not prove that any inaction on her part related to the ID Lawsuit. Benson Dep. 48:7-18.

A reasonable fact finder could not find from the evidence that Kosloski was involved in assigning McGowan to Benson's unit or that any action or inaction on her part was motivated at least in part by Benson's filing of the ID Lawsuit. The "[t]emporal proximity [of these events to when the ID Lawsuit was served] is relevant but not dispositive." *Wilson v. Northcutt*, 441 F.3d 586, 592 (8th Cir. 2006). Benson has not submitted affirmative evidence from which a reasonable fact finder could find Kosloski acted from a retaliatory motive, and Benson's belief that she did is insufficient. *Id.* Accordingly, the Court recommends that Defendants' motion be granted with respect to additional retaliation by Kosloski.[15]

### b.   McGowan

Benson claims that McGowan threatened him by saying things like "we'll make your life hell" and "I'll give you something to sue about." Whether such comments were made is matter of considerable dispute. At least one other client, the client whose room Benson was accused of visiting, heard the "something to sue about" comment. McGowan maintains she never said these things. Taking the evidence in the light most favorable to Benson, for purposes of this motion only, the Court assumes that McGowan did in fact say these things to Benson.

"Threats alone can constitute an adverse action if the threat is capable of deterring a person of ordinary firmness from engaging in constitutionally protected conduct."

---

[15] In the Complaint, Benson alleged that Kosloski engaged in other retaliatory conduct, including but not limited to a search of Benson's room that occurred on July 15, 2016. *See, e.g.*, Compl. ¶¶ 19, 21; *see Benson III*, 2019 WL 2017319, at *8. Benson has not put forth evidence regarding Kosloski's involvement in these events, nor did he subsequently identify them as a basis for his retaliation claim against her. *See, e.g.*, Benson's Answers to Interrogs. at 4, 17; Benson Dep. 46:3-48:21; *cf.* Benson Dep. 63:9-21.

*Beane v. Hennepin Cty. Jail*, No. 15-cv-205 (DWF/BRT), 2015 WL 4545374, at *5 (D. Minn. July 27, 2015) (citing *Santiago v. Blair*, 707 F.3d 984, 992 (8th Cir. 2013)); *see Evenstad*, 994 F. Supp. 2d at 1001 ("Verbal threats of retaliation may constitute 'adverse actions,' such as [a] prison official threatening to 'screw' an inmate (in more profane terms), kill an inmate, or poison an inmate.") (citations omitted); *see also Hardy v. Adams*, No. 16-2055, 2018 WL 3559190, at *3 (6th Cir. Apr. 13, 2018). "But, it would trivialize the First Amendment to hold that harassment for exercising the right of free speech was always actionable no matter how unlikely to deter a person of ordinary firmness from that exercise." *Naucke v. City of Park Hills*, 284 F.3d 923, 928 (8th Cir. 2002) (quotation omitted). "The 'ordinary-firmness' test is an objective one . . . ." *Santiago*, 707 F.3d at 992 (quotation omitted). "[T]he question is not whether [Benson] himself was deterred, though how [Benson] acted might be evidence of what a reasonable [civilly committed person] would have done." *Id.* (quotation omitted). The "ordinary-firmness" test considers "what a [civilly committed person] of ordinary firmness would have done in reaction to [McGowan's comments]." *Id.*

Courts have repeatedly held comments like the ones McGowan made to Benson are too vague and non-specific to be actionable. These include threats by prison staff to "ramp[] things up," *Evenstad*, 994 F. Supp. 2d at 1001 (quotation omitted); make an inmate's "life hell," *Hardy*, 2018 WL 3559190, at *3 (quotation omitted); "put a case on" an inmate, *Johnson v. Govern*, No. 2:17-CV-125, 2018 WL 6321548, at *2 (W.D. Mich. Dec. 4, 2018) (quotation omitted); "get" an inmate, *Snelling v. Gregory*, No. 1:17-CV-P41-GNS, 2017 WL 2602591, at *3 (W.D. Ky. June 14, 2017) (quotation omitted); and

have an inmate "regret" proceeding with a grievance, *Kyle v. Skipper*, No. 1:19-cv-353, 2019 WL 3729384, at *5 (W.D. Mich. Aug. 8, 2019) (quotation omitted); *see also Snelling*, 2017 WL 2602591, at *3 (listing cases).

While McGowan issued the June 26 BER to Benson, that BER is not actionable for the reasons stated above. It is undisputed that Benson had no further interactions with McGowan after June 26. Nor has Benson put forth evidence showing that McGowan's comments would have been likely to deter a civilly committed person of ordinary firmness from pursuing a lawsuit. *See Jones v. Harcey*, No. 11-cv-616 (MJD/AJB), 2012 WL 2884920, at *13 (D. Minn. Feb. 9, 2012), *adopting report and recommendation*, 2012 WL 2885114 (D. Minn. July 13, 2012). Indeed, Benson's multiple complaints regarding McGowan after the incident suggest otherwise. *See Santiago*, 707 F.3d at 992. "Without more, the vagueness of the alleged threat precludes any finding that a person of ordinary firmness would be deterred from engaging in protected conduct." *Hardy*, 2018 WL 3559190, at *3. Accordingly, the Court recommends that Defendants' motion be granted with respect to additional retaliation by McGowan.

### C. Procedural Due Process (Count VIII)

In Count VIII, Benson alleges that his right to procedural due process was violated when he was twice placed on Protective Isolation Status in the HSA. Benson alleges that he was not "presented with any evidence" to support his placement, Compl. ¶ 92, and there was no indication "that any less restrictive alternatives to confinement in the HSA . . . were considered," Compl. ¶ 93.

"The Due Process Clause of the Fourteenth Amendment ensures that states do not deprive individuals of life, liberty, or property without due process of law." *Mills v. City of Grand Forks*, 614 F.3d 495, 498 (8th Cir. 2010) (citing U.S. Const. amend XIV, § 1); *accord Singleton v. Cecil*, 176 F.3d 419, 424 (8th Cir. 1999). "Due process is a flexible concept, requiring only 'such procedural protections as the particular situation demands.'" *Clark v. Kansas City Missouri Sch. Dist.*, 375 F.3d 698, 702 (8th Cir. 2004) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976)); *accord Mickelson v. Cty. of Ramsey*, 823 F.3d 918, 924 (8th Cir. 2016) (noting "requirements of due process are not rigid").

"The federal constitution requires that both civil detainees and pretrial detainees be afforded procedural due process protections before they are subjected to punishment." *Benson v. Piper*, No. 16-cv-509 (DWF/TNL), 2016 U.S. Dist. LEXIS 190502, at *19-20 (D. Minn. Dec. 8, 2016) [hereinafter *Benson I*], *adopting report and recommendation as modified*, *Benson II*, 2017 U.S. Dist. LEXIS 158017; *accord Benson II*, 2017 U.S. Dist. LEXIS 158017, at *8; *see, e.g.*, *Bell v. Wolfish*, 441 U.S. 520, 535 (1979) ("In evaluating the constitutionality of conditions or restrictions of pretrial detention that implicate only the protection against deprivation of liberty without due process of law, . . . the proper inquiry is whether those conditions amount to punishment of the detainee."); *Hall*, 801 F.3d at 919 ("We have not previously decided whether the 'conditions of confinement' standard for pretrial detainees applies to involuntarily committed individuals. We now apply that standard.").

"Not all restrictions imposed in the civil commitment context will amount to punishment." *Benson II*, 2017 U.S. Dist. LEXIS 158017, at *9. "[I]f a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.'" *Bell*, 441 U.S. at 539 (footnote omitted); *accord Hall*, 801 F.3d at 919. These legitimate governmental objectives include maintaining order and security. *Bell*, 441 U.S. at 540; *Benson II*, 2017 U.S. Dist. LEXIS 158017, at *9; *see Hall*, 801 F.3d at 919. "Conversely, if a restriction or condition is not reasonably related to a legitimate goal-if it is arbitrary or purposeless-a court permissibly may infer that the purpose of the governmental action is punishment . . . ." *Bell*, 441 U.S. at 539.

The undisputed evidence shows that Benson was placed on Protective Isolation Status in the HSA on December 6 and 7 after openly violating his pre-hearing restriction status again and again. *See Hall*, 801 F.3d at 919. Benson's flagrant defiance jeopardized the ability of MSOP staff to maintain security and order at the facility. MSOP has a legitimate governmental interest in maintaining order and a secure environment at its facilities. *Senty-Haugen*, 462 F.3d at 887-88; *see Hall*, 801 F.3d at 919-20.

Many of Benson's arguments focus on other purported incidents of targeting and retaliation that were previously dismissed from this litigation. Benson uses these incidents to argue that his placement in the HSA was disproportionate to the arguably minor restrictions he refused to follow and cannot be considered reasonably related to a legitimate governmental objective. Benson argues that "[a] 'potential' safety and security

40

risk is a far cry from requiring security and it[s] archaic oubliettes to reduce risk of harm to clients, staff, and the public."  Benson's Mem. in Opp'n at 28.

Evidence in the record shows that, if left unchecked, this type of insubordination by one client could well encourage other clients to be equally recalcitrant, creating a dangerous situation for MSOP staff and clients alike.  The Eighth Circuit has repeatedly held that facilities like MSOP are subject to the same institutional safety and security concerns as corrections facilities.  *See, e.g.*, *Ingrassia*, 825 F.3d at 897; *Beaulieu*, 690 F.3d at 1028; *see also Senty-Haugen*, 462 F.3d at 887 ("The safety of the [MSOP] facility is one of the key responsibilities of Offender Program officials . . . ."), 888 (MSOP officials "have a 'vital interest' in maintaining a secure environment").  It cannot reasonably be debated that management of a secure facility like MSOP would be impossible if individuals were permitted to openly violate rules without consequence. Benson has not come forward with specific facts showing there is a genuine issue for trial regarding MSOP's enforcement of its rules as being reasonably related to its legitimate goals of maintaining security and order.  *See Johnson Tr. of Operating Eng'rs Local #49 Health & Welfare Fund v. Charps Welding & Fabricating, Inc.*, 950 F.3d 510, 524 (8th Cir. 2020) ("Conclusory assertions and citations to one's own arguments are insufficient to survive summary judgment."); *see also Woodworth*, 891 F.3d at 1088.

As Defendants point out, Benson "was given numerous opportunities to comply with the restrictions and only placed in [the] HSA when his behaviors continued to escalate and it was evident that he was not going to comply without further intervention." Defs.' Reply at 6-7, ECF No. 137.  Benson's placement on Protective Isolation Status in

41

the HSA on December 6 and 7 for a temporary period of time after less restrictive alternatives had plainly proven ineffective was reasonably related to maintaining security and order at the Moose Lake facility. *See Hall*, 801 F.3d at 919-20. As a result, Benson's placement did not amount to punishment in the constitutional sense, and Defendants are entitled to summary judgment on Count VIII.[16] *See id.*; *Benson II*, 2017 U.S. Dist. LEXIS 158017, at *8-9 ("The threshold inquiry, therefore, is whether Plaintiff was punished."); *see also Green v. Lake*, No. 14-cv-1056 (ADM/SER), 2019 WL 1324851, at *5 (D. Minn. Mar. 25, 2019) [hereinafter *Green II*] ("Green's placement in [the] HSA for more than 24 hours and being handcuffed for four hours did not impose a significant and unusual hardship in relation to the ordinary incidents of life at a secured facility such as MSOP.").

### D. Unreasonable Searches (Counts IV & V)

The Fourth Amendment generally protects "against unreasonable searches and seizures." U.S. Const. amend. IV. In Counts IV and V, Benson claims the unclothed visual body searches on December 6 and 7 constituted unreasonable searches. "[I]nvoluntarily civilly committed persons retain the Fourth Amendment right to be free from unreasonable searches that is analogous to the right retained by pretrial detainees." *Beaulieu*, 690 F.3d at 1028 (citing *Serna*, 567 F.3d at 948-49).

To determine "reasonableness" in an institutional setting, a court must balance "the need for the particular search against the invasion of personal rights that the search

---

[16] Because the Court concludes that no constitutional violation occurred, the Court declines to address Defendants' arguments regarding the personal involvement of Gianinni, Johnson, Lind, Cowell, and Collelo in Benson's placement on Protective Isolation Status in the HSA. Defs.' Mem. in Supp. at 12, 25. *See Beaulieu*, 690 F.3d at 1033 n.7.

entails." *Bell*, 441 U.S. at 558-59. Four factors are relevant to determining whether the unclothed visual body search was reasonable: "(1) the justification for initiating the search, (2) the scope of the particular intrusion, (3) the place in which the search is conducted, and (4) the manner in which it is conducted." *Schmidt v. City of Bella Villa*, 557 F.3d 564, 572 (8th Cir. 2009). Evaluating such a claim also "turns in part on the extent to which this [c]ourt has sufficient expertise and information in the record to mandate, under the Constitution, the specific restrictions and limitations sought by those who challenge the visual search procedures at issue." *Florence v. Bd. of Chosen Freeholders of the Cty. of Burlington*, 566 U.S. 318, 322 (2012). "In addressing this type of constitutional claim courts must defer to the judgment of correctional officials unless the record contains substantial evidence showing their policies are an unnecessary or unjustified response to problems of [institutional] security." *Id.* at 322-23.

The first factor, justification for the search, weighs in favor of Defendants. MSOP policy requires that clients undergo an unclothed visual body search before being placed in the HSA. "MSOP has legitimate concerns in conducting an [unclothed visual body search] when an individual at MSOP enters a new area . . . ." *Green v. Lake*, No. 14-cv-1056 (ADM/SER), 2019 WL 2016781, at *7 (D. Minn. Jan. 30, 2019) [hereinafter *Green I*], *adopting report and recommendation as modified*, *Green II*, 2019 WL 1324851 (D. Minn. Mar. 25, 2019); *see Larson v. Jesson*, No. 11-cv-2247 (PAM/LIB), 2018 WL 3352926, at *4 (D. Minn. July 9, 2018) ("And still other decisions have found reasonable institutional polices requiring unclothed body searches before detainees are placed in segregated units such as MSOP's HSA."). Requiring unclothed visual body searches

prior to placement in the HSA promotes the safety of MSOP clients and staff by ensuring that a client does not bring an object into the HSA that could be used to harm himself or others. *See Green I*, 2019 WL 2016781, at *7 ("MSOP is promoting the security of its facility by ensuring that individuals are not concealing drugs or weapons when leaving and entering new areas of the facility.").

Benson takes issue with the "obligatory" nature of the search, arguing that there is no evidence suggesting that he was suspected of possessing contraband or thinking about hurting himself or others. Courts in this district, however, have held that transfer to the HSA alone provides ample justification for an unclothed visual body search. *See, e.g.*, *Ivey v. MSOP*, No. 12-cv-30 (DWF/TNL), 2020 WL 3064720, at *7 (D. Minn. May 20, 2020), *adopting report and recommendation*, *Ivey v. Williams*, 2020 WL 3060782 (D. Minn. June 9, 2020), *appeal filed*, No. 20-2405 (8th Cir. July 13, 2020); *Green I*, 2019 WL 2016781, at *7; *Larson*, 2018 WL 3352926, at *4. Further, Benson's argument is precluded by the *Karsjens* class action, which included all clients at MSOP's Moose Lake Facility and upheld MSOP's policy of conducting unclothed visual body searches without considering a client's individual risk. *Karsjens v. Piper*, 336 F. Supp. 3d 974, 994-96 (D. Minn. 2018); *see, e.g.*, *Gardner v. Minnesota*, No. 16-cv-3999 (JNE/KMM), 2019 WL 1875590, at *4-7 (D. Minn. Apr. 26, 2019); *Whipple v. Edwards*, No. 13-cv-2861 (JRT/HB), 2019 WL 1324862, at *5-6 (D. Minn. Mar. 25, 2019).

The next factor is the scope of the intrusion. The Eighth Circuit has acknowledged that an unclothed visual body search "is intrusive and unpleasant," and "[t]he intrusion of such a search is significant." *Serna*, 567 F.3d at 954 (quotation

omitted).  As Benson stood naked, MSOP staff conducted their visual inspection, which included having him turn around and bend over.  It is undisputed the searches were conducted by MSOP staff of the same gender as Benson.  *See id.* at 947; *see, e.g.*, *Richmond v. City of Brooklyn Center*, 490 F.3d 1002, 1008 (8th Cir. 2007) ("[S]trip searches should be conducted by officials of the same sex as the individual to be searched.").  There was no physical contact.

The Court does not doubt Benson's feelings of humiliation during this process. The intrusion Benson experienced, however, is similar to an intrusion approved of in *Serna*.  Similar to this case, the defendants in *Serna* "visually inspect[ed] the patients' bodies," and "instructed each patient to turn, bend over slightly, and spread his buttocks." 567 F.3d at 947.  While noting the search was "intrusive," the Eighth Circuit concluded it was "not any more intrusive or demeaning than" the search approved by the Supreme Court in *Bell* and affirmed the grant of summary judgment in favor of the defendants.  *Id.* at 954 (quotation omitted).  Because the unclothed visual body searches of Benson were no more intrusive than the search conducted in *Serna*, this factor also weighs in favor of Defendants.

The third factor is the location of the search.  As best as this Court is able to tell based on the record, the unclothed visual body searches occurred in the same room in which Benson was placed in the HSA with the door open.  Again, there is no dispute that the searches were performed by male MSOP staff and Wyatt was not involved in the actual searching of Benson.  Benson testified that Wyatt was standing with a group of

45

staff members outside the door on December 6 and another group of staff members was again outside the door on December 7.

"[A] strip search or a body cavity search conducted in the presence of unnecessary spectators is less reasonable than one conducted in the presence of only those individuals needed to conduct the search." *Harris v. Miller*, 818 F.3d 49, 62 (2d Cir. 2016) (per curiam); *see Richmond*, 490 F.3d at 1008 ("[S]trip searches should be conducted in an area as removed from public view as possible without compromising legitimate security concerns."); *see also Ivey*, 2020 WL 3064720, at *8. Benson has put forth no evidence from which a reasonable jury could conclude that the searches were conducted in a space so exposed as to be said to be open to public view; the presence of Wyatt or any of the other staff members was inconsistent with their duties; Wyatt or any of the other staff members watched the search; or that the staff members conducting the search knew that other staff members could view the search from outside the room. *See Robinson v. Hawkins*, 937 F.3d 1128, 1137-38 (8th Cir. 2019); *Story v. Foote*, 782 F.3d 968, 971-73 (8th Cir. 2015); *Ivey*, 2020 WL 3064720, at *8; *cf. Story*, 782 F.3d at 972 ("In any event, the male officers did not violate [a male inmate's] clearly established rights by conducting the inspection in a location where a female officer also may have viewed the search from the master control room through a video feed from a security camera."); *see also Robinson*, 937 F.3d at 1143 ("The law thus did not place Hawkins on clear notice that it was unreasonable for a male officer to observe her search of [a female arrestee] from a distance in case Hawkins needed assistance.") (Colloton, J., concurring in part and dissenting in part). The third factor favors neither Benson nor Defendants.

The fourth and final factor is the manner in which the search was conducted. "Body-cavity searches should not be performed in a degrading, humiliating or abusive fashion." *Story*, 782 F.3d at 972-73 (quotation omitted). Each search lasted approximately two minutes. Benson testified that neither search was conducted in an abusive manner. To the extent Benson claims that MSOP staff refused to remove the handcuffs unless he complied with the unclothed visual body searches, this use of handcuffs is consistent with MSOP policy and in response to the safety risks posed in the event a staff-assisted unclothed visual body search is needed. "The Court must defer to this judgment unless the record contains 'substantial evidence showing [MSOP's] policies are an unnecessary or unjustified response to problems of [institutional] security.'" *Ivey*, 2020 WL 3064720, at *9 (quoting *Florence*, 566 U.S. at 323) (second alteration in original). This factor therefore also weighs in favor of Defendants.

In the end, the four *Bell* factors must be considered together; no one factor is dispositive. *See Byrd v. Maricopa Cty. Sheriff's Dep't*, 629 F.3d 1135, 1142 (9th Cir. 2011). On this record, drawing all inferences in favor of Benson, the Court concludes that no reasonable jury could find the unclothed visual body searches of Benson on December 6 and 7 violated his Fourth Amendment rights. "[A] strip search is not *per se* unconstitutional merely because it takes place in the presence of other inmates and employees of the facility—of either sex—during the search." *Perez v. Ponte*, 236 F. Supp. 3d 590, 623 (E.D. N.Y. Feb. 14, 2017) (quotation omitted), *adopting report and recommendation*, 2017 WL 1050109 (E.D. N.Y. Mar. 15, 2017); *see, e.g.*, *Montgomery v. Hall*, No. 11 Civ. 4645 (PAC) (GWG), 2013 WL 1982920, at *4 (S.D. N.Y. May 15,

2013) (listing cases), *adopting report and recommendation*, 2013 WL 3816706 (S.D.N.Y. July 22, 2013). The unclothed visual body searches of Benson were reasonably justified by safety concerns and the need to prevent the introduction of items into the HSA that a client could use to injure himself or others or that another client could use for these purposes. Although intrusive by their very nature, the searches were conducted quickly, humanely, and in a manner consistent with *Serna*. There is no evidence in the record suggesting the searches were conducted in an area generally open to public view. Therefore, the Court recommends that Defendants' motion be granted with respect to Counts IV and V.[17]

### E. Supervisory Claims

Because the Court has concluded that Benson's constitutional rights were not infringed, his supervisory claims "automatically fail for lack of an underlying constitutional violation."[18] *Mendoza v. U.S. Immigration & Customs Enf't*, 849 F.3d 408, 420 (8th Cir. 2017); *see, e.g.*, *Brossart v. Janke*, 859 F.3d 616, 627 (8th Cir. 2017); *Brockinton v. City of Sherwood*, 503 F.3d 667, 673 (8th Cir. 2007); *see also Schoettle v. Jefferson Cty.*, 788 F.3d 855, 861-62 (8th Cir. 2015) ("We have long held that neither municipal nor supervisory liability may attach in section 1983 actions unless individual liability is first found on an underlying substantive claim."); *Moore v. City of Desloge*, 647 F.3d 841, 849 (8th Cir. 2011) ("Similarly, to maintain an action for training or

---

[17] Other than the scope of Wyatt's participation discussed herein, the Court similarly declines to address Defendants' arguments regarding the personal involvement of Wyatt, Beavens, and Shorter in the unclothed visual body searches. Defs.' Mem. in Supp. 28-29. *See supra* n.16.

[18] For this reason, the Court likewise declines to address Defendants' arguments regarding the personal involvement of Johnson Piper, Richardson, Moser, Kneisel, Sadjak, and Benoit. *See supra* n.16.

supervisory liability, a plaintiff must show the failure to train or supervise caused the injury.").

## V. RECOMMENDATION

Based on the foregoing, and all of the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendants' Motion for Summary Judgment, ECF No. 95, be **GRANTED**, and this matter be **DISMISSED WITH PREJUDICE** and judgment entered accordingly.


Date: July___29___, 2020                              _____*s/ Tony N. Leung*_____
                                                      Tony N. Leung
                                                      United States Magistrate Judge
                                                      District of Minnesota


                                                      *Benson v. Piper et al.*
                                                      Case No. 17-cv-266 (DWF/TNL)


## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).